Ron COPAS, et al., Plaintiffs,

v.

**EAST BAY MUNICIPAL UTILITY DISTRICT, Defendant.**

No. C–92–3649 PJH.

United States District Court, N.D. California.

May 26, 1999.

Duane W. Reno, Davis Reno & Courtney, San Francisco, CA, for Plaintiffs.

Jylana Collins, Robert C. Helwick, East Bay Municipal Utility District, Oakland, CA, Arthur A. Hartinger, Edward L. Kreisber, Leibert Cassidy & Frierson, San Francisco, CA, for Defendant.

## MEMORANDUM AND ORDER

HAMILTON, United States Magistrate Judge.

Now before the court is the motion of defendant East Bay Municipal Utility District ("EBMUD" or "the District") for summary judgment. Having read the parties' papers, reviewed the evidence submitted, and carefully considered the parties' arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## INTRODUCTION

EBMUD, which is a publicly-owned utility, supplies water and provides wastewater treatment for parts of Alameda and Contra Costa Counties. EBMUD serves 20 incorporated cities and 15 unincorporated communities, and employs approximately 1900 employees, divided among 10 departments. Most of the water used by EBMUD comes from the watershed of the Mokelumne River, which collects water from the melting snows of Alpine, Amador,

and Calaveras Counties. Other sources of water are the runoff from the local watershed, plus limited access to water from the American River (to offset deficiencies in drought years).

Plaintiffs, who are employees of EBMUD, filed this proposed class action for overtime compensation and liquidated damages pursuant to section 16(b) of the Fair Labor Standards Act of 1938, as amended ("FLSA"), 29 U.S.C. § 201, et seq. The FLSA requires employers to pay employees overtime compensation for all hours worked over forty per week, unless the employees are "employed in a bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. §§ 207, 213. Approximately 85 per cent of EBMUD employees are designated hourly and are entitled to overtime compensation, and approximately 15 per cent are designated exempt. This case was filed by a number of plaintiffs who had been designated exempt, each of whom asserted that he or she was nonexempt and therefore entitled to overtime compensation.

Six plaintiffs remain in the case—Ida A. McClendon, Gayle B. Montgomery, Thomas F. Fox, Clark G. Sharick, William D. Kerr, and Bruce A. Lepore. EBMUD now seeks summary judgment that the remaining six plaintiffs fall within the executive and/or administrative exemption.

## DISCUSSION

### A. Legal Standard

#### 1. Summary Judgment

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* In ruling on a motion for summary judgment, the court may not weigh the evidence, and is

required to view the evidence in the light most favorable to the nonmoving party. *See id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *See id.* If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

#### 2. FLSA Exemptions

The FLSA requires employers to pay overtime compensation to all employees who do not fall within the three exemptions. *See* 29 U.S.C. § 213 (exempt employees include those "employed in a bona fide executive, administrative, or professional capacity," as defined by the Department of Labor). The employer bears the burden of establishing that an employee falls within an exemption, *see Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 7 (1st Cir.1997); and the exemptions must be "narrowly construed against the employers seeking to assert them." *See Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

The FLSA does not articulate the parameters of the three exemptions; the ap-

plication of the exemptions is set forth in the regulations and interpretations promulgated by the Secretary of Labor, pursuant to 29 U.S.C. § 213. The Secretary's regulations have the force of law, *see United States v. Nixon*, 418 U.S. 683, 695, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and are to be given controlling weight unless found to be arbitrary, capricious, or contrary to the statute. *See Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The interpretive regulations, on the other hand, are not conclusive, as they merely set forth the Secretary's position regarding the application of the regulations in specific contexts. *See Reich v. John Alden*, 126 F.3d at 8. "Even so, these interpretations have the 'power to persuade, if lacking power to control,' as they 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

The interpretative regulations emphasize that "job titles [are] insufficient as yardsticks" in determining the importance of an employee to the employer, or the employee's exempt or nonexempt status under the regulations. "Titles can be had cheaply and are of no determinative value." 29 C.F.R. § 541.201(b). The status of any particular employee must be determined on the basis of whether his or her duties, responsibilities, and salary meet all the requirements of the appropriate section of the regulations. *See* 29 C.F.R. § 541.201(b)(2).

**B. Defendant's Motion for Summary Judgment**

▮ Department of Labor regulations establish two tests for classification as exempt white collar employees: the "duties" test and the "salary" test. *See* 29 C.F.R. §§ 541.1–541.3. Generally, employees must satisfy both tests before they can be classified as exempt. *See Barner v. City of Novato*, 17 F.3d 1256, 1259–60 (9th Cir. 1994). The issue remaining for decision in this case is whether the six above-named plaintiffs are exempt employees under the "duties" test. EBMUD contends that all six qualify under the administrative exemption, and that three of the six—Bruce A. Lepore, William D. Kerr, and Thomas F. Fox—also qualify under the executive exemption.

1. The executive and administrative exemptions

   a. The executive exemption

The requirements of the executive exemption are set forth at 29 C.F.R. § 541.1. An employee whose salary is more than $250 a week[1] qualifies for the executive exemption if that employee's primary duty consist of "management of the enterprise" in which she is employed "or a customarily recognized subdivision thereof."[2] In addition, the employee must customarily and regularly direct the work of two or more employees. *See id.*

Duties that may qualify a position as "management" for purposes of the executive exemption include i) interviewing, selecting, and training employees; ii) directing employees' work; iii) appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in their status; iv) handling employee complaints and grievances, and disciplining when necessary; v) planning the work; vi) determining the techniques to be used; vii) apportioning the work among the workers; and viii) determining the type of materials, supplies, machinery, or tools to be used or

---

1. The evidence in this case indicates that each plaintiff earned more than $250 a week during the time periods at issue.

2. The test used to determine any of the three exemptions—executive, administrative, or

professional—for employees who earn more than $250 a week is referred to as the "short test," as contrasted with the more detailed "long test." *See, e.g., Barner*, 17 F.3d at 1260–61 & nn. 5–6.

merchandise to be bought, stocked, or sold. *See* 29 C.F.R. § 541.102.

To determine whether an employee has management as his or her "primary duty," the court may look at the amount of time spent on those duties. "In ordinary cases ... primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his [or her] time in management would have management as [the] primary duty." 29 C.F.R. § 541.103. Where an employee spends less than 50 percent of his or her time on managerial duties, the employee might still qualify under the executive exemption if other factors support such a conclusion. Those factors include

the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, [the employee's] relative freedom from supervision, and the relationship between [the employee's] salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

*Id.*

### b. The administrative exemption

The requirements of the administrative exemption are set forth at 29 C.F.R. § 541.2. An employee whose salary is more than $250 a week qualifies under the administrative exemption if, first, that employee's primary duty is the performance of non-manual work "directly related to management policies or general business operations" of the employer or the employer's customers; and second, if the employee exercises "discretion and independent judgment." *See* 29 C.F.R. 541.2(a).

An employee performs work directly related to management policies or general business operations of the employer (i) if the employee is engaged in "administrative" rather than "production" activity, and (ii) if the administrative activity is of "substantial importance" to management or operations. *See* 29 C.F.R. § 541.205. Administrative work is the work performed by so-called white collar employees engaged

in "servicing" a business—as, for example, "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). Examples of employees in administrative positions include buyers in industrial plants and retail establishments; personnel analysts; and advisory specialists and consultants such as credit managers, safety directors, claims agents and adjustors, wage-rate analysts, tax experts, account executives at advertising agencies, stock brokers, and promotion people. *See* 29 C.F.R. § 541.205(c)(1)–(c)(5).

"Production" or "line" work, by contrast, entails producing the product of the employer's business. Although the traditional model of production work is factory manufacturing or assembly-line work, the concept is not limited to the manufacturing setting. *See, e.g., Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 903 (3rd Cir. 1991), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). Courts have frequently analogized from the factory setting to other work settings. *See, e.g., Dalheim v. KDFW–TV,* 918 F.2d 1220, 1226 (5th Cir.1990) (producers, directors, and assignment editors in a television station "produce" newscasts, and thus are nonexempt workers); *Cooper Elec.,* 940 F.2d at 903 (inside salesperson whose primary duty is to sell the employer's products performs production work); *Gusdonovich v. Business Info. Co.,* 705 F.Supp. 262, 264–65 (W.D.Pa.1985) (insurance claims adjustor who produces information for the company's clients performs production work).

The distinction between "administrative" and "production" work is illustrated by the case of *Reich v. John Alden.* In that case, the Secretary of Labor sought to enjoin the John Alden Life Insurance Company ("John Alden") from violating FLSA's overtime requirements. The Secretary argued that John Alden's marketing representatives were not exempt administrative employees because they were engaged in

"production" rather than "administrative" activities. The district court ruled in favor of John Alden, and the First Circuit agreed, finding that John Alden was in the business of designing, creating, and selling insurance policies to the public, and that the "products" created by the company were the insurance policies themselves. Because the marketing representatives were not involved in the design or generation of the policies, they could not be considered "production" employees, and were therefore exempt. The court also found that the day-today activities of the marketing representatives were

> more in the nature of "representing the company" and "promoting sales" of John Alden products, two examples of exempt administrative work provided by [29 C.F.R.] § 541.205(b) ... As John Alden's primary contact with the insurance market (via agent contacts), marketing representatives represent the company by keeping the market informed of changes in John Alden's product offerings and pricing structure. Further by advising agents as to which of John Alden's products to market against competing products, and by helping them to put together proposals for bidding on new business, marketing agents are ... engaged in "something more than routine selling efforts...." Rather, their agent contacts are "aimed at promoting ... customer sales generally," activity which is deemed administrative sales promotion work under section 541.205(b).

*Reich v. John Alden*, 126 F.3d at 9 (citations omitted).

The *John Alden* court distinguished the Third Circuit's decision in *Cooper Electric*, where the court found that the salespeople for an electrical parts wholesaler were nonexempt because they were "production" employees. That is, because the company's primary purpose was to produce sales of electrical products, the salespeople were engaged in generating the very product that the company existed to market—the sales of electrical products. The court explained that in *John Alden*, by contrast, the insurance company actually produced a product of its own—insurance policies—and did not exist merely to produce sales of another company's policies. *See id.* In addition, in line with the "servicing" component of the interpretive regulations, *see* 29 C.F.R. § 541.205(b), the *John Alden* court agreed with the Third Circuit's explanation that "servicing a business" entails "employment activity ancillary to an employer's principal production activity." *Id.* at 10 (citing *Cooper Electric*, 940 F.2d at 904).

The administrative exemption is further limited to employees who perform work of "substantial importance to management or operations." Work need not involve the formulation of management policies or the operation of a business as a whole, however, in order to qualify as work of "substantial importance."

> Employees whose work is "directly related" to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects the business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

29 C.F.R. § 541.205(c). Examples of such employees include those holding positions in personnel administration, labor relations, and research and planning, as well as those who provide assistance to management officials in carrying out their executive or administrative functions. *See id.*

The administrative exemption also requires that the exempt employee exercise "discretion and independent judgment" in his or her work. Discretion and independent judgment must be "real and substantial," that is, they must be exercised with respect to matters of consequence. 29

C.F.R. § 541.207(d)(1). The exercise of independent judgment involves "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 U.S.C. § 541.207(a). An employee who exercises independent judgment "has the authority or power to make an independent choice, free from immediate direction or supervision." *Id.*

The interpretive regulations emphasize that employees who merely apply their knowledge in following prescribed procedures or determining which procedure to follow, or who determine whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories are not exercising discretion and independent judgment. *See* 29 C.F.R. § 541.207(c)(1). Such categories of nonexempt employees include inspectors or examiners such as graders of lumber or insurance appraisers, who rely on techniques and skills acquired by special training and experience, but who basically perform work along standardized lines involving well-established techniques and procedures. *See* 29 C.F.R. § 541.207(c)(2)–(4). Other examples include personnel clerks who screen job applicants based on their conformity with specific qualifications established by the employer, as contrasted with personnel officers who make hiring decisions or recommendations; or computer programmers, as contrasted with keypunch operators or programmer trainees. *See* 29 C.F.R. § 541.207(c)(5), (7).

2. Whether the six plaintiffs are exempt[3]

a. Ida A. McClendon

Plaintiff Ida A. McClendon ("McClendon") claims that she is entitled to overtime compensation for the period from September 4, 1990, to November 1, 1995. EBMUD contends that McClendon's claim should be dismissed because she qualifies for the administrative exemption.

During the period from September 1990 through November 1995, McClendon worked in Public Information, a division of EBMUD's Public Affairs Department. Her job title was Public Information Representative II, and she reported directly to EBMUD's Manager of Public Information, David Kelsey ("Kelsey"). She testified in her deposition that her job involved public relations, and that public relations helps facilitate the District's operations. She stated that "everything we do is a PR mechanism.... We're about serving the public, making the public know what the District is doing, and trying to make them aware of the very positive things the District does to serve them." Her main duties lay in three areas: 1) writing and publications, 2) administration of the District's school program, and 3) communicating with the media, and serving as the department's primary press officer.

McClendon testified in her deposition that she was responsible for producing several EBMUD publications. For example, she created and was responsible for producing the District's "cornerstone" publication, "All About EBMUD," a 20–page, four-color publication with a budget of approximately $30,000. She described this publication as the District's major vehicle for presenting EBMUD facts and history to the public and to foreign visitors. She explained that at one time, the District had published an abbreviated "fact sheet" for public distribution, but that Jerry Gilbert, who was the District's general manager at the time, "wanted to have a kind of really polished piece for visitors to the District." It was her suggestion that the District combine its "fact sheet" and the kind of publication Gilbert wanted into a single publication. She described the project as "a challenging assignment ...

---

**3.** In reviewing the evidence submitted by the parties, the court has considered the statements in plaintiffs' declarations only to the extent that they do not purport to alter or contradict plaintiffs' sworn deposition testimony.

to create something different than we had ever had before."

McClendon also testified that she was responsible for preparing EBMUD's annual water quality report, entitled "Water Quality and Supply." In addition, she indicated that she produced internal fact sheets for the general counsel, the general manager, and the board of directors, on controversial issues that District officials believed carried a potential for litigation.

On the educational front, McClendon had overall responsibility for EBMUD's Project WATER ("Water Awareness Through Education and Research") school program, a program stressing water conservation, with an annual budget of approximately $90,000. She testified that the school program was initiated in 1974; when she took the program over in 1985, she was asked to evaluate it and make suggestions for making it more effective. Among her suggestions was that the program be expanded to include not only water conservation but also a broader environmental education focus. She testified that the scope of the program was expanded in accordance with her suggestions, with the result that a significantly greater number of teachers and schools began to utilize the program. She stated that the program now serves 450 public and private schools, and that the District gets requests for about 85,000 publications a year from teachers.

In addition to planning and assembling the publications used in the school program, which involved not only writing but also working with photographers, printers, graphic designers, and illustrators, McClendon was also responsible for supervising the contractors hired by EBMUD to implement various aspects of the program. These included the education program consultant, who advised EBMUD on the preparation of various programs and publications to be distributed to the schools, and the Small Change Original Theater, which

presented plays relating to the theme of water conservation.

McClendon also worked with representatives from five other water agencies from around the state in producing a book entitled "All About Water"—a book of water-science activities geared towards students in grades kindergarten through third. In addition, she developed a video program, "Water from East Bay Mud," which described the water and wastewater systems in combined documentary and animated footage, which was distributed to all the junior and senior high schools and public libraries in the District's service area.

With regard to media relations, McClendon testified that she was the District's principle spokesperson and a key media strategist on a variety of EBMUD projects and issues, such as the "Blue Water" issue.[4] McClendon described herself as "the person on point to answer all customer phone calls about the Blue Water, all realtor calls. Anybody calling about Blue Water was given to me. No one else was authorized to talk." She attended all the public meetings, and prepared written reports summarizing what had happened (with input from technical people and from EBMUD's general counsel), which were given to the Board of Directors "to keep [them] up to date in closed sessions."

Plaintiffs concede that McClendon was "highly skilled in public relations work," but contend that she does not qualify under the administrative exemption because her work primarily involved the application of acquired skills rather than the exercise of independent judgment. Plaintiffs claim that McClendon did not choose which publications she would work on, and that nothing she wrote went out without Kelsey's approval. They also claim that she had "responsibility" for the school program, but had no "authority" over it, because all program decisions were made by Kelsey or Public Affairs Department Manager Artis Dawson ("Dawson"). For example, plain-

---

4. "Blue Water" refers to a problem that EBMUD had with copper leaching into the water supply, which tended to give the water a blue cast.

tiffs assert that McClendon did not set the school program budget, had no authority over how the budgeted funds were spent, did not "hire" vendors or authorize the payment of vendor bills, and did not negotiate contracts. They contend that her role with regard to the "Blue Water" issue was merely to "keep track of activities" and "keep the department manager informed." They claim that she did not "define" the Blue Water strategy—that at most, she merely "made suggestions." Finally, they deny that she was regularly sought out by managers and other supervisors, and contend that she was only occasionally asked for her ideas or thoughts.

Plaintiffs argue that McClendon engaged in work that was substantially similar to the work performed by the plaintiffs in *Dalheim*. In that case, the Fifth Circuit found that a group of television news producers, directors, and assignment editors were not exempt administrative employees because their work was not directly related to management policies or business operations. *See Dalheim*, 918 F.2d at 1223–24. The court explained that 29 C.F.R. § 541.205(a) distinguishes exempt administrative employees from nonexempt on the basis that the primary duty of the exempt employees is "administering the business affairs of the enterprise," while the primary duty of the nonexempt employees is "producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Id.* at 1230. The court concluded that the duties of the producers, directors, and assignment editors clearly related to the production of the news department's "product," and not to any of the administrative tasks described in § 541.205(a) because the nature of their work primarily involved the application of acquired skills. *See id.* at 1231. Plaintiffs argue that McClendon's work in the District's Public Relations Department is similar to the work of the television producers, directors, and assignment editors in *Dalheim* in that her primary duty was to apply acquired skills (public and media relations) in the production of

the written publications that were the "product" of her department.

Plaintiffs also argue that McClendon, like the plaintiffs in *Bratt v. County of Los Angeles*, 912 F.2d 1066 (9th Cir.1990), *cert. denied*, 498 U.S. 1086, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991), did not provide advice to her employer on management policies or general business operations. In *Bratt*, eight County employees filed suit, claiming that they had accumulated overtime hours for which they had not been paid. Six of the employees were employed as deputy probation officers, and the remaining two employees were employed by the Department of Children's Services as counselors. The County argued that the employees were exempt because their duties were akin to those of advisory specialists or consultants such as stock brokers or insurance claims agents and adjusters—positions the regulations characterize as meeting the test of "directly related to management policies or general business operations." *Id.* at 1069–70 (citing 29 C.F.R. § 541.205(c)(5)). The County claimed that the employees should be considered exempt administrative employees because they were essentially "servicing" the "business" of the courts by "advising the management." *Id.* at 1070.

The Ninth Circuit disagreed, finding that the employees were not exempt, because they were not engaged in "the running of [the County's] business." *Id.* at 1069–70. The court stated that "advising the management," as that term is used in 29 C.F.R. § 541.205(b), is directed at "advice on matters that involve policy determinations, *i.e.*, how a business should be run or run more efficiently, not merely providing information in the course of the daily business operations," noting that the "services" provided by the employees to the County's court system "do not relate to court policy or overall operational management but to the courts' day-to-day production process." *Id.* at 1070. As an example, the court found that while the probation officers did offer recommenda-

tions to the courts, those recommendations did not constitute advice on the proper way to conduct the business of the court, but rather simply involved information that the court used in the course of its daily production activities. The court found that "[t]he test [stated in the regulations] is whether the activities are directly related to management policies or general business operations," and that none of the employees were engaged in "activities primarily related to management policies or general business operations." *Id.* Plaintiffs argue that, like the county employees in *Bratt,* McClendon offered advice and made recommendations relating to the District's daily production activities.

■ The court finds, however, that EBMUD has met its burden of establishing that McClendon was an exempt employee during the relevant period, and that plaintiffs have not provided evidence that creates a disputed issue of material fact. The undisputed evidence shows that McClendon, as a public relations officer, was engaged in "servicing" EBMUD's business, and that her duties were directly related to EBMUD's management policies and general business operations. Unlike the news producers and directors in *Dalheim,* who were found nonexempt because they performed the day-to-day production activities of the television station—i.e., newscasts—McClendon was not engaged in "production" or "line" work. The services that McClendon provided to EBMUD did not relate to the day-to-day production of the East Bay's water supply or the treatment of wastewater. Rather, they related directly to EBMUD's community outreach and public information functions, which are part of the District's general business operations. Similarly, unlike the probation officers and counselors in *Bratt,* who conducted factual investigations and provided information that was used in the court's day-to-day operations, the fact sheets and reports that McClendon researched and wrote were used by the District to inform its public relations policies, part of its general business operation. McClendon her-

self stated in a 1994 letter to Kelsey that she was "regularly sought out by managers and supervisors for professional advice on public information issues." Because McClendon's primary job duties involved the running of EBMUD's business, not the day-to-day carrying out of its affairs, she meets the first prong of the two-part test for the administrative exemption.

The evidence also shows that McClendon exercised discretion and independent judgment with respect to matters of significance. "[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207(a). Nevertheless, the term "discretion and independent judgment" as used in the regulations "does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." 29 C.R.F. § 541.207(e). Indeed, the decisions made by the employee may merely lead to recommendations for further action. *See id.* The fact that an employee's decisions are subject to review, and that they may on occasion be reversed, or the recommendations rejected, "does not mean that the employee is not exercising discretion and independent judgment." *Id.* Thus, in this case, the fact that McClendon was assigned to work on particular EBMUD publications, rather than being free to choose her own assignments, and the fact that her written work product was approved by a supervisor or supervisors before it was released to the public in the form of a District publication, rather than being released unedited, do not preclude the exercise of discretion and independent judgment.

McClendon testified in her deposition that she designed and implemented the school program, and that she was relatively free from immediate direction and supervision. (She testified in her deposition

that Kelsey—her immediate supervisor— "didn't care about [it]" and simply "looked at it when it was all through.") She also testified that she defined the "Blue Water" strategy, which "helped [the District] in the litigation by not getting out there and owning the whole thing."

According to McClendon, the Public Affairs Department relied on her to answer questions from media as diplomatically as possible. Her 1991 management performance review states that her performance was "consistently above expectation," describing her notable accomplishments as researching and writing a national conference presentation for EBMUD's General Manager on the subject of the 1989 earthquake; significantly expanding the scope of and participation in the school programs, thereby producing "substantial public-relations benefits to the District;" and serving as a media spokesperson on two major issues, including the "Blue Water" problem. The performance review describes McClendon as an "acknowledged authority and principal news source" on "Blue Water" and other subjects.

Her 1992 management performance review praises her role as the District's media spokesperson during the October 1991 Oakland Hills fire, when she "singlehandedly handled all communications during the most intense first hours of the emergency, and then shared responsibility for hundreds of media inquiries over the next several weeks;" and notes her continuing responsibility as the District's principal spokesperson for the Blue Water issue. Her January and March 1993 performance appraisals note that her school program responsibilities had expanded significantly over the previous year, that she had served as the District's representative to an inter-agency program sponsored by the U.S. Forest Service, and had been asked to speak at a national workshop sponsored by the American Water Works Association. She was again described as the District's principal spokesperson on the Blue Water issue. Her 1995 performance evaluation states that McClendon had "volunteered and been requested to serve throughout the District on education and career-related committees," that she was generally regarded by others as an expert in this area, and that she had brought "a great deal of good will and positive reaction to the District through her work and dedication to that program."

McClendon exercised independent judgment and discretion with respect to matters of significance. Work of "significance" is not limited to the work of only the highest-level employees, those who formulate management policies. It also includes work that affects policy or the work of those administrative employees whose responsibility it is to execute or carry out policy. *See* 29 C.F.R. § 541.207(d). Artis Dawson, Manager of the Public Affairs Department during the relevant period, indicates in her declaration that McClendon managed EBMUD's School Education Program, created EBMUD's flagship school publication, *Currents*, and served as the principal media backup representative for EBMUD—all of which were significant components of the District's public relations efforts. The school program was considered sufficiently important by the District that McClendon prepared a major report defining the program and its accomplishments, which she presented to the District's board of directors in August 1994.

### b. Gayle B. Montgomery

Plaintiff Gayle B. Montgomery ("Montgomery") claims that he is entitled to overtime compensation for the period from September 4, 1990 to March 6, 1994. EBMUD contends that Montgomery qualifies under the administrative exemption.

During most of the period from September 1990 to March 1994, Montgomery worked in the Public Information Division of EBMUD's Public Affairs Department as a Public Information Representative IV. He reported to Kelsey, as did McClendon. Moreover, as the most senior person in the Public Affairs Department after Kelsey, Montgomery served as the acting manager

of the division whenever Kelsey was unavailable.

Montgomery was the primary media spokesperson for the District. He came to EBMUD with over 19 years' experience as an editor at the *Oakland Tribune*. In his deposition, he testified that the job required a person with the sort of specialized background that he brought with him from his years at the *Tribune*. He stated that it was his job to present the District in the best possible light, or to make the District appear as responsible as possible. He was responsible for representing the District in meetings with the media, community groups, business leaders, and governmental representatives. He also scheduled and coordinated the production of informational publications, such as bulletins, bill inserts, the District's annual report, as well as slide shows, films, and exhibitions. He drafted fact sheets about specific policy issues, and op-ed commentaries under the signature of members of the board of directors or the District's General Manager. He also helped create "EBMUD Reports," a publication that was distributed to approximately 2,800 community and political leaders in the area served by EBMUD.

Another of Montgomery's regular duties was to attend the meetings of the District's board of directors, where he would take notes so that he would be prepared to respond to media inquiries about what happened at the meetings. Montgomery presented the media with EBMUD's position on matters such as environmental lawsuits involving the Mokelumne River, costs and delays of the District's new administration building, the publication of "water waster" names, the implementation of a controversial rate increase, and the enforcement of a water-use cap. He responded on behalf of EBMUD to numerous media inquiries during periods of severe drought in Northern California, and during the Oakland Hills fire in the fall of 1991.

Montgomery acted in an advisory capacity to District management on media matters. He testified that when Jorge Carrasco, who served as EBMUD's General Manager after December 1990, requested Montgomery's assistance, he (Montgomery) would respond to media inquiries that had been directed at Carrasco. He also testified that whenever managers needed advice on media action, they would contact him for assistance. For example, in 1992–93, he acted as the District's key media advisor and strategist on the Penn Mine crisis,[5] and organized and implemented the media response by conducting a day-long tour of the Penn Mine for the media, producing a written wire-service advisory, talking to newspapers and broadcast reporters on the telephone, and personally handling on-site inquiries from the media.

He also advised the District on the issue of the allocation of water rights to the Mokelumne and American Rivers, following up in 1992 with visits to the editorial boards of the major newspapers to explain the District's position. He testified that because 1992 was a presidential election year, he timed these visits for the period that he knew the various newspapers would not be concentrating all their energies on the election, in the hope that EBMUD could convince the editorial boards to publish editorials favorable to the District's position, prior to the commencement of the State Water Resources Control Board hearings on the allocation of water rights. He stated that his media strategies helped EBMUD preserve its water rights to the Mokelumne and American Rivers.

Plaintiffs argue that Montgomery, like McClendon, was primarily involved in carrying out EBMUD's day-to-day public relations work, rather than in running the business or in managerial policy determinations. While they concede that Montgomery was the District's primary media

---

5. An overflow of contaminated rainwater from the Penn Mine into the Mokelumne River created a danger to fish and wildlife.

spokesperson, they contend that many of his duties are substantially the same as the duties performed by the television producers in *Dalheim* —producing news that was televised to the public; determining the content of segments of the newscast; participating in meetings to determine which stories and angles would be covered; deciding the amount of time to give to a particular story, the sequence in which stories would be aired, and when to schedule commercial breaks—duties that the *Dalheim* court found primarily involved the application of acquired skills in the production of a "product." *See Dalheim,* 918 F.2d at 1223, 1231. They assert that the resulting "product" was the presentation of EBMUD to the media in the best possible light.

Plaintiffs claim that other of Montgomery's duties resembled the duties of the appraisers in *Reich v. American Int'l Adjustment Co., Inc.,* 902 F.Supp. 321 (D.Conn.1994). In that case, the Secretary of Labor sued American International Adjustment Company, Inc. ("AIAC"), alleging that the company was required to pay its automobile damage appraisers overtime under the FLSA. The duties of the appraisers at AIAC involved gathering facts about the damaged vehicles, and determining the cost of repair. The court found that the appraisers were guided in those duties by skill and experience and by manuals that provided established labor and material costs. The court also found that AIAC was in the business of resolving damage claims, and that although the appraisers negotiated and settled claims with the insured, and dealt with issues of coverage and liability, they were basically fact finders whose job entailed carrying out the daily affairs of AIAC. *See id.* at 324–25.

Plaintiffs contend that, like the appraisers in the *AIAC* case, Montgomery's ability to act independently was circumscribed by the District, and that his role was limited to gathering facts, and utilizing his skills and experience to determine the proper course of action to be taken within a well-defined framework of management policies—duties the *AIAC* court found to

fall within the parameters of the company's "daily affairs." *See AIAC,* 902 F.Supp. at 325. Plaintiffs assert that Montgomery may have been permitted to exercise discretion and independent judgment with regard to EBMUD's day-to-day media relations, but not with respect to how EBMUD's general business operations should run or should be run more efficiently, and that he therefore did not exercise discretion and independent judgment with regard to "matters of significance" within the meaning of the administrative exemption. For example, plaintiffs contend that Montgomery used the skills and knowledge he acquired as a newspaper reporter, but that he had no choice regarding which projects he would work on, and that he spent a minuscule amount of time advising senior management, and never counseled the district's board of directors on any issue concerning EBMUD's business.

The court finds that EBMUD has met its burden of establishing that Montgomery was an exempt employee during the relevant period, and that plaintiffs have not provided evidence that creates a disputed issue of material fact. Unlike the television producers and directors in *Dalheim,* Montgomery, as a public relations officer, was engaged in "servicing" EBMUD's business, and his duties were directly related to EBMUD's management policies and general business operations. He testified that the work done by the Public Information Department provided was "an invaluable part of the District's public image … a continuing believable image of what the District was doing [which] makes it easier for East Bay MUD to operate in the community." For example, he indicated that his work on the American River issue helped persuade people to support the District's position and helped to obtain further support from local officials.

Artis Dawson states in her declaration that Montgomery was EBMUD's principal media spokesperson, and a highly re-

garded counselor to EBMUD senior management on media issues concerning the implementation of EBMUD policies and projects. Montgomery himself testified in his deposition that he acted in an advisory capacity to management.

The comments in Montgomery's performance appraisals also indicate that Montgomery's primary duties were closely related to servicing the District's business operations, rather than to its day-to-day production process, and that his role was not limited to gathering facts and the mechanical application of District policy. For example, his 1990 performance appraisal states that "[d]espite the controversial nature of many of the District's current activities, EBMUD's public image has remained generally positive largely through [Montgomery's] work through the media." His 1991 performance appraisal states that Montgomery had "performed well in his role as writer of the department's most demanding or sensitive communications," noting that he drafted almost all of the District's press releases, "a task which calls for speed," as well as most response letters for the District's Board and the General Manager, "which requires a fine blend of diplomacy and firmness." His 1992 performance appraisal indicated that one of his principle contributions was to "take command of a report on the District's post-fire activity—which was seriously stalled in another department—break the log jam, and produce a public newspaper which explains the District's actions." Montgomery was plainly viewed as more than a mere writer of press releases.

The evidence also shows that Montgomery exercised discretion and independent judgment with respect to matters of significance. The exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct. See 29 C.F.R. § 541.207(a). Montgomery's job was to communicate the position of the District's board of directors or general manager to the public, either directly or through the media. Although Montgomery's written work was passed through Kelsey, he testified that he was never given a "canned" speech to deliver to the media. As EBMUD's chief media spokesperson, Montgomery made decisions on a regular and frequent basis regarding how best to present the District's policies in order to minimize political controversy. This task necessitated the exercise of precisely the sort of judgment and discretion contemplated by the regulations.

While it is true that Montgomery applied the knowledge and experience gained from his years as a newspaper reporter, he was not a mere "technician," like the appraisers in *AIAC,* because he was also required to identify and organize key facts, evaluate the complex political ramifications of those facts, and make quick judgments with regard to the proper way to handle media inquiries, or, in other situations, to present the information in a way that would defuse potential controversy before it had a chance to emerge. The fact that Montgomery's written work, such as the EBMUD Reports, was subject to review by Montgomery's superiors, and the fact that in his oral communications to the media he was obligated to present the "party line," as he described it in his deposition, do not preclude the application of the administrative exemption. The fact that an employee's decision may be subject to review does not mean that the employee is not exercising discretion and independent judgment. See 29 C.F.R. § 541.207(e).

Montgomery exercised discretion and independent judgment on matters of significance because he participated in the formulation of policy within his sphere of responsibility, and because his work directly impacted the operation of EBMUD's business—the supplying of water and wastewater treatment for a large geopolitical section of the San Francisco Bay Area. In his 1992 performance appraisal, he was described as an indispensable staff member—"[t]he Public Information Office would be crippled without him"—and was praised for "[h]is calm, unflappable manner with the news media, regardless of the

merits of the inquiry, the crisis-level of the moment, or the demands of his personal time;" as well as his command of District information; his judgment and counsel on politically sensitive issues such as environmental lawsuits and a controversial rate increase; and his rapid and professional writing ability.

### c.   Thomas F. Fox

Plaintiff Thomas F. Fox ("Fox") claims that he is entitled to overtime compensation for the period from September 4, 1990, to October 5, 1994. EBMUD contends that Fox's claim should be dismissed because he qualifies for the administrative exemption, and from February 1994, also qualifies for the executive exemption.

Throughout most of the period between September 1990 and October 1994, Fox was employed by EBMUD as a Community Affairs Representative in the Public Affairs Department. In his deposition, Fox described the Community Affairs Representative as someone who's "trying to be the eyes and ears of the District, [which] alerts the District to problems . . . early on"—someone whose role was to smooth relations between the community and the District. Fox came to the District after serving as a member of the city council in the City of Emeryville. He testified that his background and experience as a council member—"knowing the political systems, how they work"—have helped him in doing his job.

Fox explained that the position involved two basic functions—first, "to go out and get information from the public, from people at meetings, et cetera, and to bring that information back to the District," and second, "to bring information, if any, that the District wants distributed, to bring that information out to the community." He described his job as a public relations job, but stated that his position differed from McClendon's position in Public Affairs in that McClendon was "more in the office every day doing publications," while his job required that he "go out to community meetings quite a bit and be out there

listening and taking notes and bringing that back."

Fox was responsible for representing District policy and interests to community groups, to various local governmental bodies, and to other interest groups, with a focus on fostering "mutually beneficial relations" between the District and those community groups or political entities. One of his primary duties was to serve as a liaison between EBMUD and the community. He spoke several times a week to various groups on non-technical subjects such as the drought and the District's reclamation and conservation activities. His focus was on giving an overview of District activities and their effect on the public. For audiences that required a presentation with more technical content, Fox recruited engineers and planners as speakers.

Fox testified that part of his role as a community affairs representative was to identify and defuse potential public relations problems, some of which came to his attention at one of the numerous city council meetings he attended. He testified, for example, that some Emeryville residents complained at a public meeting about the smell coming from a wastewater treatment plant and threatened to contact the press about it. Fox took the information back to EBMUD's offices, and the District was able to resolve the problem before it became a major public relations issue.

Fox also testified that he was responsible for developing strategies for "how we're going to deal with the public, how many presentations we should do, when should we do them, who should do them." For example, when EBMUD determined it was necessary to replace the Berryman Reservoir, Fox offered his ideas to the supervisor and developed a slide show and a program to explain what was wrong with the construction of the reservoir from an historical perspective—it had been built over a major earthquake fault line—so that the public would understand why EBMUD wanted to replace it.

Fox's duties including organizing and coordinating the "Key Contact Program" and the Speakers' Bureau. In addition, Fox had some responsibility for dealing with outside vendors, such as printers and graphic designers, in connection with his work on various EBMUD publications. He testified that he was authorized to choose (from a list of District-approved vendors) which vendor the District would use, subject to the constraints of affirmative action and MBE guidelines.

Fox's job also entailed attending meetings with representatives of various water districts and environmental groups around the state of California. For example, he traveled to Los Angeles once a month to meet with a group that was trying to develop a water conservation policy that would be mutually agreeable to environmentalists and water districts. Fox's role at those meetings was to monitor the proposals, to provide input based on EBMUD's policies, to bring information about those proposals from the meetings back to the District, to solicit comments regarding the proposals from various people in the District, and to return to subsequent meetings to communicate those comments to the group. He described himself as the District's "eyes and ears" at those meetings.

In February 1994, Fox was selected to fill a six-month position as a Customer Services Manager. In this new position, he supervised a staff of 28 people. He testified, however, that he continued performing some of his Community Service Representative duties: "[T]he type of work I was doing, you can't just drop it. I mean, you've got people that are depending on you, so I continued in a lot of those duties."

Plaintiffs argue that Fox's duties resembled the duties of the parole officers in *Bratt* in that it was his job to gather information which he reported to others who used that information in the course of EBMUD's daily business operation. Plaintiffs contend that there is no evidence that Fox advised management on any mat-

ters related to policy determinations—i.e., how EBMUD should be run or run more efficiently—or that he performed work related to the District's general business operations, but that his primary duty was simply to carry out EBMUD's day-to-day community relations activities. Plaintiffs also claim that even if Fox did spend some portion of his time "servicing" EBMUD's business operations, the evidence shows that he spent over 50% of his time simply attending meetings or writing, and that he therefore cannot qualify for the administrative exemption.

▇▇ The court finds that EBMUD had met its burden of establishing that Fox was an exempt employee during the relevant period, and that plaintiffs have not provided evidence that creates a disputed issue of material fact. First, the court finds that Fox qualifies under the executive exemption for the period from March 1, 1994 through October 5, 1994, because the evidence shows that he supervised more than two full-time employees during that period. (Plaintiffs do not oppose this part of the District's motion.)

Second, the court finds that Fox qualifies under the administrative exemption for the relevant period because he performed work directly related to EBMUD's management policies as his primary duty, and because his work was of substantial importance to the operation of the District's business. Unlike the probation officers and counselors in *Bratt*, who gathered facts and provided services that related to the day-to-day production process of the Los Angeles County courts—the sentencing of criminal offenders and the judicial supervision of abused and neglected children—Fox assisted the District with the administration of its general business operations by providing community affairs services. He himself testified that his role in smoothing relations between the District and the community helped facilitate the District's projects. In serving as the District's representative at public meetings, Fox was directly engaged in activities

relating to the District's administrative operations.

Fox also exercised discretion and independent judgment with respect to matters of significance. Dawson states in her declaration that Fox performed office work directly related to EBMUD's community outreach and community affairs policies and functions. She states that he negotiated contracts and developed strategy for interacting with local communities, local officials and politicians, and other public agencies in order to facilitate EBMUD's projects. In addition, as Fox testified, he supervised outside vendors and drafted District publications. More importantly, he exercised discretion when fielding questions from individuals at public meetings and from community groups and political entities such as city councils.

Plaintiffs argue that Fox did not exercise discretion and independent judgment because, as he states in his declaration, he was never allowed to use his own "summations, evaluations, or opinions regarding EBMUD policies, plans, or activities" when meeting with community groups or political organizations, and anything he said had to be cleared beforehand with his supervisors. Plaintiffs contend that Fox's position required that he merely apply his writing skills and public relations abilities in following prescribed procedures. Fox's deposition testimony clearly indicates, however, that a key responsibility that underlay all other responsibilities was that he respond diplomatically to all questions, but that he not provide a substantive response to any inquiry if that response might prove politically embarrassing to the District or if he had not been authorized to speak on behalf of the District on that subject. This is precisely the sort of discretion and judgment involving "the comparison and evaluation of possible courses of conduct and acting or making a choice after the various possibilities have been considered," that is prescribed by the regulations. *See* 29 C.F.R. § 541.207(a).

### d. Charles G. Sharick

Plaintiff Charles G. Sharick ("Sharick") claims he is entitled to overtime compensation for the period from September 4, 1990 through June 30, 1994, when he retired from EBMUD. EBMUD contends that Sharick's claim should be dismissed because he qualifies under the administrative exemption.

During the period September 1990 through June 1994, Sharick worked in EBMUD's personnel department as a Personnel Analyst III. He testified that he began working for the District in 1966, and that he was promoted in 1985 to the position of Principal Management Analyst, a position he held until approximately 1989. He testified, however, that although he held the title and received the salary of Principal Management Analyst, he did not perform the duties of that position. He claimed that he was promoted to that position "to remove me from the job of Employment Supervisor" because of some philosophical differences between himself and management regarding the implementation of the District's affirmative action policy. He stated further that after he had been receiving the salary for that position for several years, while not performing the duties specified for the position, he was told that he would have to take a demotion. At that point (1990), he was given the position of Personnel Analyst III.

As a Personnel Analyst III, Sharick reported directly to Larry Yok ("Yok"), who served as the Secretary of the District's Retirement Board, and also as the Manager of EBMUD's Personnel Department. Yok stated in his declaration that the Retirement Board was responsible for creating and implementing the policy of EBMUD's Employee Retirement System ("ERS"), which served approximately 2000 former employees. Yok was ultimately responsible for overall administration of the ERS.

During the period from January 1991 and August 1993, Sharick also reported to John Hill ("Hill"), who served as Manager

of Employment. (Hill, in turn, reported to Yok.) Sharick testified in his deposition that his primary duty during the relevant period was to assist Yok and Hill in the administration of the Employee Retirement System (ERS), and that he was also occasionally asked to complete short projects for the Human Resources Department which were unrelated to the ERS. He testified that he was the only personnel analyst who worked on the ERS. He claims, however, that his work was not analytical and that he did not exercise independent judgment and discretion in the performance of this duty, but instead followed detailed procedures set forth in the rules of the District's Retirement Board and the Retirement Ordinance.

For example, he states in his declaration that he did an annual mailing of an application for health insurance benefits to approximately 700 retirees and surviving spouses. The mailing also included information about the low-income adjustment. When the applications were returned, he reviewed them to determine whether each retiree was eligible under the rules and what amount the retiree should receive. He testified in his deposition that after he had reviewed the applications, he prepared a work sheet that the accounting department used to pay the benefit. He periodically prepared a report for the Retirement Board consisting of a summation of the applications and their disposition. He testified that "all of this was done exactly according to the relevant policy in the retirement system ordinance and the very specific procedures detailed in the retirement board rules, and all subject to the review and edit of [Hill and Yok . . . . who] review[ed] my compliance with the procedures for its administration at each step along the way." The entire process (mailing the applications, reviewing the completed applications, authorizing the payment of benefits) lasted approximately

three and a half months; consequently, Sharick's involvement was heaviest during that period.

Sharick testified that another of his assigned projects was to administer the low-income adjustment program.[6] In his declaration, he states that he sent an application for the low-income adjustment for any retiree who requested one, and reviewed those completed applications for eligibility under the rules. He testified that if the applicants didn't qualify, he communicated with them to explain the reasons. He also assisted with the determination of the amount of the annual COLA for retirees, which involved obtaining the amount of the Consumer Price Index from the Department of Labor and applying it to the previous year's retirement allowance for each retiree. He testified that he drafted various memoranda relating to the above-described projects, and that his work was edited and approved by Yok and Hill.

According to Sharick's testimony, he also worked gathering the information that went into various memos to the Retirement Board under Yok's name. For example, his research was included in memos on the subject of modifying the Retirement Board rule on the low-income adjustment, and on the subject of amending the Retirement Ordinance to extend participation in the ERS to participants in the District's job sharing program. Sharick also gave presentations on the subject of the ERS at Retirement Board workshops, and assisted the District's actuary in compiling the information required for the annual actuarial and valuation reports. Finally, during the year before he retired from EBMUD, Sharick compiled a desk manual documenting all his job duties and procedures with regard to the ERS. He testified that he worked on the manual on and off during that period, whenever he had time.

6. Sharick testified in his deposition that EBMUD "didn't want District retirees to be poverty stricken," and accordingly provided an adjustment to the retirement benefit amount of any retiree whose total income, including Social Security, was less than two times the official poverty level (one and a half times for surviving spouses) to bring the amount up to that level.

Both Yok and Hill state in their declarations that Sharick spent the greatest percentage of his time performing work for the ERS. Yok states that he (Yok) had numerous responsibilities apart from overseeing the ERS and that he relied on his staff (including Sharick) to research and analyze issues, draw conclusions, and make recommendations to help the Retirement Board administer the system. Yok states in his declaration that Sharick performed office work directly related to the policies and operations of EBMUD's retirement system, and that the role he played was a crucial one because he was the only personnel analyst working on the system. Yok states that Sharick utilized his discretion and independent judgment in working on projects such as determining low income adjustments and COLA adjustments, and in administering the health insurance benefits of EBMUD's retirees. Yok also states that Sharick worked on projects lasting anywhere from a few weeks to several months.

Hill states that Sharick performed research and analytical work that provided the basis for Hill's decisions on a variety of personnel issues during that period, with the majority related to ERS issues. He also states that until August 1993, Sharick performed most of the duties of the position of Retirement System Administrator, which was unfilled at that time. In August 1993, Hill was selected for that position; he states in his declaration that he relied on Sharick to help him perform most of his new administrative duties. These duties included 1) preparing and reviewing the enrollment, retirement, or termination of members in the system, and counseling employees and retirees on various aspects of the system; 2) drafting, analyzing, and recommending legislation for review of the Retirement Board and approval by the District's board of directors; 3) participating in the selection of providers of professional services—banking, actuarial, investment management—for the retirement trust fund; and 4) coordinating and managing special studies relating to administration of the retirement fund. Sharick testified that one of his assigned tasks in 1994 was to provide an orderly transfer of duties from himself to Hill.

Plaintiffs assert that Sharick was nonexempt during the period 1990 to 1994 because his job involved the performance of day-to-day tasks such as applying the retirement system's rules and regulations to applications for benefits and assisting applicants in the preparation of applications for retirement and health insurance benefits; and because his job did not permit the exercise of independent judgment and discretion. Plaintiffs claim that because Sharick spent 80 to 90 per cent of his time in performing routine duties in connection with assisting Yok and Hill in administering the ERS, most of his duties should be classified as "clerical." Plaintiffs also claim that Sharick did not exercise discretion and independent judgment with regard to matters of consequence because he was required to follow the detailed procedures set forth in the Retirement Board Rules and Retirement Ordinance with regard to aspects of the system such as health insurance benefits, the low-income adjustment, and the cost-of-living adjustment.

■ The court finds, however, that EBMUD has met its burden of establishing that Sharick was an exempt employee during the relevant period, and that plaintiffs have not provided evidence that creates a disputed issue of material fact. The job of administering employee benefits does not relate to EBMUD's day-to-day production activities; Sharick's duties were directly related to the District's management policies or general business operations because his primary responsibility was to execute the District's retirement policies. *See* 29 C.F.R. § 541.205(c). As the only personnel analyst working on the ERS, Sharick performed work of substantial importance to the operation of EBMUD's business because his primary responsibilities involved coordinating and administering the ERS.

The evidence also shows that Sharick exercised discretion and independent judgment with respect to matters of significance. Although Sharick, like any administrator in the field of employee benefits, was obligated to act in conformance with applicable rules and regulations, and although he operated under the ultimate supervision of Yok, his responsibilities encompassed more than the performance of routine clerical duties. For example, he prepared memoranda that resulted in Retirement Board resolutions, he was requested by upper management to salvage the employee suggestion system, and he compiled information and prepared an annual report pursuant to the terms of a settlement agreement. Moreover, his salary was approximately 50 per cent higher than the salary of Rose Mary McLain, who regularly provided clerical support for him during the relevant period. Any routine work that he performed, such as reviewing insurance applications for completeness, was directly and closely related to the performance of his exempt primary duties, and therefore exempt. *See id.; see also Spinden,* 94 F.3d at 428.

Although Yok was ultimately responsible for overall administration of the system, he relied on Sharick to research and analyze issues and to make recommendations to help him and the Retirement Board administer the system. The regulations do not require the decisions made by the employee have "a finality that goes with unlimited authority and a complete absence of review," 29 C.F.R. § 541.207(e), but simply that the employee compare and evaluate possible courses of conduct and make decisions free from immediate supervision. *See* 29 C.F.R. § 541.207(a). Sharick exercised discretion and independent judgment in communicating with EBMUD's retirees, in researching issues such as poverty levels, and in drafting memoranda to the Retirement Board.

Moreover, the evidence shows that Sharick spent a significant amount of time during his last year at EBMUD documenting the tasks he performed in carrying out his responsibilities with respect to the health insurance benefits, the low-income adjustment benefit, and the cost-of-living adjustment. He prepared this desk manual at the District's request to aid the transfer of his duties to someone else after his retirement. Plainly, as the duties of his position had not previously been written down, he was required to exercise discretion and independent judgment in determining which procedures were proper, and also in authoring the desk manual as a guide for future employees. The regulations require that an exempt administrative employee exercise discretion and independent judgment, not that the employee constantly exercise such discretion and judgment. *See* 29 C.F.R. §§ 541.2, 541.207(g).

### e. William D. Kerr

William D. Kerr ("Kerr") claims he is entitled to overtime compensation for the period from December 24, 1990, through December 30, 1992. EBMUD contends that Kerr's claim should be dismissed because he qualifies both for the administrative exemption and for the executive exemption.

During this period from December 1990 through December 1992, Kerr worked as the District's Facility Supervisor. He began working at EBMUD in 1990 following 27 years' service as a marine mechanic in the United States Navy. Kerr reported directly to Tom Tellefsen ("Tellefsen"), the Facilities Manager at EBMUD. Kerr assisted Tellefsen on some matters—for example, he helped prepare the Facilities Division's operating budget, and worked on the proposed $100,000 contract with Honeywell for maintenance on the life safety system—and he worked independently on others, or independently with final approval by Tellefsen.

Kerr testified in his deposition that he had overall responsibility for operating and maintaining the District's main administration building, which houses 750 EBMUD employees in Oakland. He oversaw the final construction and opening of the new building (from the maintenance standpoint), which required, among other

things, that he check the building for problems, bring any problems to the attention of the contractor, and follow up on the corrective action.

He also worked alongside a representative from Honeywell, so that he could learn to operate the computer systems that facilitated operation of the building. (He explained that the operation and control of most of the systems in the building—including the ventilation system, the master control system, the plumbing and electrical systems, the air conditioning and refrigeration units, the life safety system, and the security system—were computerized.) Moreover, until the District hired two new employees and Kerr trained them, he was the only employee who knew how to run those computer systems.

Once the building had opened, Kerr spent the majority of his time operating and maintaining the automated life safety system, and the air conditioning equipment, ventilation system, and plumbing, electrical, and computerized automation systems. He testified that he used vendors for some of the maintenance work (elevators, air conditioning system) and that he secured contracts with vendors in the range of $10,000 to $15,000. For these smaller contracts, Kerr attempted to locate vendors in line with the District's hiring goals, and drafted purchase orders for Tellefsen's signature. (Contracts for amounts over $20,000 were handled by Tellefsen. They were subject to bids, and the final agreements had to be approved by the District's board of directors.) Kerr also was responsible for ensuring that outside contractors performed their work adequately. For example, he monitored Honeywell's performance of the work under the maintenance contract, once the work had begun.

Kerr described his job as a critical one, because 750 people relied on him for their safety. He stated that as the facility supervisor, he was responsible for the operation and maintenance of the facility security system, as well as for developing an emergency plan for evacuation of the building in case of fire or earthquake, and for working with the fire department in the event of an emergency.

Kerr testified that at the time he was hired as facility supervisor, it was his understanding that the District would be hiring two additional employees to assist him. The funding for the two positions was not approved, however, until the fiscal year following (1991–1992). Once the board of directors had approved the funding and authorized the hiring of the two employees, Kerr interviewed the candidates who were recommended by the panel interview board and made recommendations regarding who should be hired. The two new employees began working under Kerr beginning in September 1991. (Kerr testified that before September 1991, he performed his own job duties as facility supervisor, plus many of the duties of the facility staff that had not yet been hired.)

■ The court finds that Kerr qualifies as an exempt executive employee for the period from September 1991 through December 30, 1992, because he worked as the facility manager and customarily and regularly directed the work of two facility technicians. *See* 29 C.F.R. § 541.1. Kerr had direct input into the hiring decision, and was responsible for training, directing, supervising, evaluating, and disciplining those two employees once they had begun working. When one of the employees failed to meet the requirements of the job, Kerr counseled her on her job performance, and ultimately terminated her. The court finds, however, that Kerr does not qualify under the administrative exemption because his primary duty did not involve the performance of office work directly related to EBMUD's management policies or general business operations.

The District argues that Kerr qualifies as an administrative employee, based on similarities between Kerr's duties and responsibilities and those of the plaintiffs in *Spinden v. GS Roofing Prods. Co., Inc.*, 94 F.3d 421 (8th Cir.1996), *cert. denied,* 520 U.S. 1120, 117 S.Ct. 1254, 137 L.Ed.2d 334

(1997) and *O'Dell v. Alyeska Pipeline Service Co.*, 856 F.2d 1452 (9th Cir.1988), where the Eighth and Ninth Circuits, respectively, found the plaintiffs to be exempt administrative employees.[7]

In *Spinden*, the controller of a roofing products plant ("Spinden") claimed that his work comprised "menial, everyday bookkeeping jobs," and that he was therefore a nonexempt employee. The evidence showed that his responsibilities included maintaining all accounting and personnel records; preparing tax returns, payroll, budgets, and monthly journal entries; and analyzing production costs. He also computerized the plant's accounting procedures, attended weekly staff meetings with the plant manager and superintendents, and signed equipment leasing contracts on behalf of the plant. *See Spinden*, 94 F.3d at 424. The trial court found that Spinden was nonexempt because he spent 80 to 90 per cent of his time in routine work—"mere bookkeeping" or work that did not require "management-type decisions." *Id.* at 425. The Eighth Circuit reversed, on the basis that the percentage of time an employee spends on administrative tasks is but one factor in determining whether administration is that employee's primary duty. *See id.* at 427. The court concluded that Spinden was an exempt employee because his primary duty as the controller of the plant consisted of the performance of office work directly related to management policies or the general business operations of the company. *See id.* at 428.

In *O'Dell*, a field inspector for an oil pipeline company claimed that he was a nonexempt employee. He worked without supervision at remote field locations along the Alaska Pipeline, and his duties included observing work and assuring compliance with regulations and industry standards, and auditing records to ensure compliance with federal agency requirements. He had the authority to attempt to resolve discrepancies on site by negotia-

tion with the project supervisor, and he also represented the company in contacts with state inspectors, offered assistance to contractors in interpreting codes, and made recommendations to the company regarding further action. The trial court found that plaintiff was nonexempt because he did not "customarily and regularly exercise[ ] discretion and independent judgment." *See O'Dell*, 856 F.2d at 1453–54 (citing 29 C.F.R. § 541.2 (the "long test")).

The Ninth Circuit reversed, on the basis that plaintiff's salary placed him within the group of employees whose claim is governed by the "short test," and that under that test, the company had only to show that he had performed "work requiring the exercise of discretion and independent judgment"—not to show that he "customarily" performed such work—to qualify plaintiff as an exempt employee. *See id.* at 1454. The court found that because plaintiff clearly exercised "some discretion and independent judgment" during the course of his job, he was an exempt employee. *See id.*

Based on the reasoning in *Spinden* and *O'Dell*, the District argues that Kerr should be found exempt because, among other things, he was the only employee involved with the final construction and opening of the administration building, he ensured that outside contractors performed their work correctly and to his satisfaction, he was hired for a critical job wherein 750 people relied on him for their safety, he could hire outside vendors, he monitored and made changes to a $100,000 contract, he reported to his supervisor only when he had a problem he could not solve, he earned a higher salary than his two subordinates, and he helped his supervisor prepare a budget. The court finds, however, that the evidence does not support EBMUD's position with regard to this claim and that EBMUD has not met

---

7. The District also relies on *Campbell v. U.S. Air Force*, 755 F.Supp. 897 (E.D.Cal.1990), but that decision was vacated by the Federal Circuit and is therefore not persuasive authority. *See* 972 F.2d 1352 (Fed.Cir.1992).

its burden of showing that Kerr qualifies as an exempt administrative employee.

First, in testifying that he was "the only one that was involved with the final construction and opening of the building from the maintenance standpoint," Kerr was referring to the fact that he was the only person who had the knowledge to train the two technicians hired by EBMUD in 1991 because he was the only person who had learned how all the systems in the building functioned. Second, the fact that Kerr had the responsibility of ensuring that outside contractors performed their work correctly, the fact that 750 people relied on him for their safety, and the fact that he reported to his supervisor only when he had a problem he could not solve do not transform his job into an "office" job. Third, his assistance with the preparation of the budget was at the request of Tellefsen, and whatever time he contributed to that project did not constitute a major portion of his time on the job. Finally, the fact that his salary was higher than that of the two employees he supervised is to be expected, based on the differences in the level of their responsibilities.

Nor do the holdings in *Spinden* and *O'Dell* compel a finding that Kerr qualifies under the administrative exemption. In *Spinden*, the plaintiff was an office worker who handled all aspects of the roofing plant's financial operations. In this case, by contrast, while Kerr assisted his supervisor in the preparation of the budget for the maintenance department, he had no involvement with any of EBMUD's financial operations or its business management. In *O'Dell*, the plaintiff was responsible for managing the oil pipeline services in his assigned territory. Although he did not have a "desk job," he was nevertheless considered an administrative employee engaged in "servicing" the business, who exercised discretion and independent judgment within the meaning of the regulations. Kerr, on the other hand, was a maintenance supervisor who performed manual labor operating and maintaining the District's main administration build-ing, and cannot be classified as an exempt administrative employee.

#### f. Bruce A. Lepore

Plaintiff Bruce A. Lepore ("Lepore") claims he is entitled to overtime pay for the period from January 14, 1991 through February 28, 1993. EBMUD contends that Lepore's claim should be dismissed because he qualifies under both the administrative exemption and the executive exemption.

Throughout the period from January 1991 through February 1993, Lepore served as EBMUD's Occupational Health and Safety Administrator. In this deposition, Lepore testified that he was directly responsible for coordinating and implementing the District's occupational health and safety program and worker's compensation program. Lepore testified that his 18 years of OSHA experience made him particularly well-qualified for his position at EBMUD. He explained that as part of his job responsibilities, he would inform supervisors and managers in various EBMUD divisions and departments regarding whether their safety programs were in compliance with the applicable regulations.

Lepore also coordinated and monitored the District's accident prevention program—he investigated accidents; analyzed the causes of accidents; reviewed accident reports; implemented measures to prevent the recurrence of accidents; secured instructors, equipment, training aids, and facilities for safety training; participated in the presentation of safety training programs; and monitored new developments relating to safety programs and regulations. In addition, he attended meetings with regulatory agencies such as Cal/OSHA and attended California Workers' Compensation Appeals Board hearings on matters relating to EBMUD employees.

He also interacted with outside vendors and consultants on health and safety issues. For example, whenever EBMUD hired outsiders to provide safety training required by regulation, Lepore was in

charge of locating the providers, entering into contracts with the providers, and setting up and organizing the training sessions. He was responsible for preparing draft budgets and making budget recommendations. He also created EBMUD's "Employee Pocket Guide to Workplace Health and Safety."

During the relevant period, Lepore reported to Mark Berenberg ("Berenberg"), EBMUD's Manager of Employee Relations. Lepore testified that Berenberg deferred to him on OSHA issues. In his declaration in support of the District's motion, Berenberg stated that Lepore was directly responsible for EBMUD's health and safety programs. Berenberg described those programs as "consistent with EBMUD's policy to ensure a safe and healthful workplace and otherwise act in compliance with applicable state and federal laws related to health and safety." In Berenberg's deposition, he testified that Lepore "was the expert in Occupational Health and Safety, and if he told me that we needed to do something to meet compliance, I would say, 'Let's do it.'" Berenberg described Lepore's role at EBMUD as "significant" and "critical" because Lepore "had the responsibility of ensuring the safety of all [EBMUD's employees] as well as managing the program, using his judgment in regards to his experience, his lengthy experience in regards to making sure that we were running the best program we could."

Another of Lepore's job responsibilities was the coordination of the Employee Assistance Program, whereby the District contracted with providers of psychological and counseling services and legal services. Berenberg testified that the District made these services available to employees who needed assistance in resolving personal or work-related problems. The program also offered elder-care and child-care referrals, as well as financial services. It was Lepore's responsibility to ensure that information about these services was communicated to EBMUD's employees.

In addition, Lepore had substantial responsibility for workers' compensation matters at EBMUD. For example, he testified that he regularly hired and supervised third-party investigators, and evaluated and made recommendations regarding settlement of workers' compensation claims. Berenberg testified that Lepore had some authority to read and sign settlement agreements. Lepore also testified that he recommended a change in the District's third-party claims administrator; and that after the recommendation was adopted, he monitored the contract. In addition, he had the authority to veto the claims administrator's designation of the legal representative for workers' compensation claims against the District.

Lepore testified that when he began working at EBMUD, he supervised one employee, Gerald Gordon, the Occupational Health and Safety Assistance Planner. In addition, when he was hired, he was told that he would receive clerical assistance from Mary Breland ("Breland"), an administrative clerk. He testified that Breland reported to him part time.[8] The District hired another assistant for Lepore in 1993. Lepore was responsible for drafting performance plans for the employees he supervised.

■ The court finds that the District has not met its burden of showing that Lepore was an exempt executive employee, because it has not provided evidence that Lepore customarily and regularly supervised the work of two full-time employees or the equivalent during the relevant period. *See* 29 C.F.R. § 541.105. The evidence shows that Lepore supervised one employee full-time (Gerald Gordon) and a second employee most, but not all, of the time (Mary Breland). The District autho-

---

8. Lepore testified that Breland divided her time 50–50 between himself and Berenberg. Berenberg testified that Breland spent approximately 90 per cent of her time working with "the Occupational Health and Safety folks" and the remainder of her time backing up his secretary or answering the telephones. Berenberg referred to Lepore as Breland's "supervisor."

rized a second assistant position in 1993, and Lepore testified that he hired Sandy Beecher in late February 1993 (at which point he qualified under the executive exemption).

■ The court does find, however, that the District has met its burden of establishing that Lepore qualifies as an exempt administrative employee, and that plaintiffs have not provided evidence that creates a disputed issue of material fact. The evidence shows that Lepore's primary duties involved the performance of nonmanual work directly related to the District's general business operations. His work entailed administrative rather than production activity because he served as the District's advisory specialist on health and safety issues. *See* 29 C.F.R. §§ 541.201(2), 541.205(c)(5). He was responsible for assisting the District's various departments and divisions in developing their health, safety, and accident prevention programs, and coordinated and maintained those programs. He interpreted OSHA regulations and regularly made recommendations to senior management regarding the District's compliance with health and safety laws and regulations. He also recommended a change in EBMUD's third-party workers' compensation administrator.

Lepore's work also required the exercise of discretion and independent judgment. His duties involved more than the mere use of acquired skills in applying techniques, procedures, and standards. He was responsible for reviewing the health and safety plans of the various EBMUD departments and divisions, analyzing those plans for compliance with federal and state laws and regulations, and communicating to the managers any deficiencies he found. Both he and Berenberg testified that Berenberg knew little about health, safety, and workers' compensation issues when he was assigned to the position as Manager of

Employee Relations. Berenberg testified that Lepore worked essentially without supervision during the first six to eight months that he was on the job, and that he regularly deferred to Lepore on OSHA issues. Moreover, after working at his position for a short time, Lepore determined that he required an additional staff person to assist him. He communicated this need to Berenberg, received authorization for a second assistant, and hired another person to work in the OSHA unit.

Plaintiffs argue that Lepore's primary duty at EBMUD was to provide information to the various departments on health and safety issues. They claim that he did not exercise independent judgment and discretion because his job was limited to checking the safety programs against the regulations to "make sure the programs complied with the regulations." The court finds, however, that the District has met its burden of showing that Lepore performed work requiring the exercise of discretion and independent judgment. Under the short test, the District is not required to show that Lepore constantly performed work requiring the exercise of discretion and independent judgment, but simply that he exercised "some discretion and independent judgment during the course of his job." *See O'Dell,* 856 F.2d at 1454.

## CONCLUSION

In accordance with the foregoing, defendant's motion is GRANTED insofar as it seeks summary judgment that plaintiffs Ida A. McClendon, Gayle A. Montgomery, Thomas A. Fox, Charles G. Sharick, and Bruce A. Lepore were exempt administrative employees under FLSA during the relevant periods, and that plaintiff William D. Kerr was an exempt executive employee under FLSA for the period from September 1991 through December 1992. The motion is otherwise DENIED. Plaintiff's countermotion for summary judgment is DENIED as untimely.[9]

9. At the March 17, 1998, case management conference, the court set a deadline of August 25, 1998, for the filing of dispositive motions. At that time, the parties represented to the court that they anticipated filing simultaneous cross-motions for summary judgment. EBMUD filed its motion for summary judgment on August 25, 1998. Plaintiffs filed a "coun-

This order fully adjudicates the motions listed at Nos. 90 and 100 of the clerk's docket for this case. A telephone status conference will be held on Friday, June 4, 1999, at 10:00 a.m. The trial date of June 1, 1999, is hereby VACATED.

**IT IS SO ORDERED.**

ter-motion" on September 8, 1998. The court does not consider a "counter-motion" filed two weeks after the dispositive motions filing deadline to be a cross-motion.