Stephen ADAMS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 90–162C.

United States Court of Federal Claims.

April 27, 2005.

---

See, also, 65 Fed.Cl. 217, 2005 WL 976017.

Jules Bernstein and Edgar James, Washington, D.C., for plaintiffs. Linda Lipsett, Washington, D.C., of counsel.

Shalom Brilliant with whom were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

BUSH, Judge.

This case is before the court on Defendant's Cross–Motion for Partial Summary Judgment as to Certain Plaintiffs filed on June 26, 2002, which was raised in opposition to plaintiffs' April 26, 2002 motion for partial summary judgment, a motion recently decided by this court's opinion of December 1, 2004, *Adams v. United States,* No. 90–162C and Consolidated Cases, slip op. at 43–44 (Fed.Cl. Dec. 1, 2004) (*Adams III*). As stated in *Adams III,* the court held in abeyance its determination of defendant's cross-motion.[1] *Id.* at 2. This procedural posture has had the effect of carving out certain claims of specific plaintiffs (who numbered nine as of the filing of defendant's cross-motion) from the greater body of the claims of plaintiffs (who numbered several thousand) that were decided by *Adams III.*

---

1. Three other pending motions before the court concern the "driving time issue." Defendant filed a driving time issue motion for partial summary judgment on August 12, 2002 for two groups of plaintiffs who had settled all other outstanding claims in this case, while plaintiffs and defendant filed driving time issue cross-motions for partial summary judgment on August 2 and September 22, 2004, concerning another group of plaintiffs who had similarly settled all other outstanding claims in this case. Decisions on these three driving time issue motions were

## BACKGROUND

### I. Procedural History

This matter has a long history, much of which has been recounted in *Adams v. United States,* 27 Fed.Cl. 5 (1992) (*Adams I*), *rev'd and remanded,* 178 F.3d 1306, 1998 WL 804552 (Fed.Cir.1998) (Table and Unpublished Opinion) (*Adams II*), and *Adams III.* Only the facts relevant to the motion at hand are related here. Of the thousands of plaintiffs pursuing overtime pay claims in these consolidated cases, plaintiffs' April 26, 2002 motion concerned "non-supervisory GS–12 and GS–13 occupational code 1811 criminal investigators [in] the Bureau of Alcohol, Tobacco and Firearms [ (BATF) ], United States Customs Service [ (USCS) ], Drug Enforcement Administration [ (DEA) ], Internal Revenue Service [ (IRS) ] and United States Secret Service [ (USSS) ] between February, 1987 and October, 1994." Pls.' Apr. 26, 2002 Mot. at 1. Plaintiffs requested in their motion for partial summary judgment that the court find the concerned plaintiffs "non-exempt" under the Fair Labor Standards Act (FLSA) overtime provisions, 29 U.S.C. §§ 201–219 (2000). Settlement intervened before plaintiffs' motion was decided, however, and the claims of the GS–12 code 1811 criminal investigators at the five agencies concerned were resolved and dismissed. Stipulations of Partial Dismissal of August 29, 2003 and November 2, 2004.[2]

Thus, when the court decided plaintiffs' April 26, 2002 motion in *Adams III,* it only decided the remaining GS–13 claims at the five agencies, and from those GS–13 claims it excluded the claims of the certain plaintiffs included in defendant's cross-motion for partial summary judgment. *Adams III,* No. 90–162C and Consolidated Cases, slip op. at 15. Of the nine plaintiffs originally included in

also held in abeyance in *Adams III,* to allow for scheduled briefing to be completed. These motions are decided in a separately published opinion of this date.

2. The November 2, 2004 stipulation was inadvertently overlooked in *Adams III,* No. 90–162C and Consolidated Cases, slip op. at 15, and the court's statement that IRS Internal Security Division GS–12 claims "have not been resolved by the settlements [to date]" was factually incorrect.

defendant's cross-motion, two, Mark Owen King and James R. Martin, had only GS–12 claims that were subsequently resolved by settlement and thus have no remaining claims for the court to consider. A third, Frederic J. Geiger, had both GS–12 and GS–13 service for which he claimed non-exempt overtime status, but defendant only presented evidence as to his GS–12 service. Because no evidence regarding Mr. Geiger's GS–13 exemption status was presented by defendant, and only GS–13 claims are at issue here, defendant's cross-motion for partial summary judgment is denied as to any remaining claims for Mr. Geiger.[3] For the reasons discussed *infra*, plaintiffs' April 26, 2002 motion for partial summary judgment will be granted on those claims for which defendant's allegations of proof are deficient. Therefore, plaintiffs' April 26, 2002 motion for partial summary judgment is granted as to any remaining GS–13 claims of Mr. Geiger.

This leaves the GS–13 overtime back pay claims of six plaintiffs, Jose A. Grossett, J. Lawrence Cunningham, Lawrence J. Sams, Michael A. Lee, Robert A. Reid and Sharon K. Wheeler, to be discussed in detail and decided here.

## II. Statutory and Regulatory Framework

FLSA overtime provisions, requiring time and a half pay for hours worked beyond certain limits, are subject to the exemptions contained in 29 U.S.C. § 213. Section 213(a)(1) provides that these overtime pay requirements do not apply to any employee who is "employed in a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). Only the administrative exemption is at issue in this case.

■ Employees are presumed to benefit from FLSA overtime requirements, although the employer may overcome this presumption by proving that the employee is subject to one of the statute's exemptions. *Adams I*, 27 Fed.Cl. at 10 (citation omitted). The Federal Circuit has recognized that the government has the burden of demonstrating that an employee is exempt from FLSA overtime provisions. *Berg v. Newman*, 982 F.2d 500, 503 (Fed.Cir.1992) (citation omitted). There are several criteria governing the administrative exemption at issue in this motion.[4]

■ The current version, substantively unchanged from the version governing the relevant years of service at issue in this case, of the Office of Personnel Management's (OPM) regulation concerning the administrative exemption for federal employees states:

§ 551.206 Administrative exemption criteria.

An *administrative employee* is an advisor or assistant to management, a representative of management, or a specialist in a management or general business function or supporting service and meets all four[5] of the following criteria:

(a) *Primary duty test.* The primary duty test is met if the employee's work—

(1) Significantly affects the formulation or execution of management programs or policies; or

(2) Involves management or general business functions or supporting services of substantial importance to the organization serviced; or

(3) Involves substantial participation in the executive or administrative functions of a management official.

(b) *Nonmanual work test.* The employee performs office or other predominantly nonmanual work which is—

(1) Intellectual and varied in nature; or

---

**3.** Plaintiffs' counsel stated at oral argument that "we believe that Mr. Geiger's claim has been settled in full," Transcript of June 30, 2004 Oral Argument (Tr.) at 78, but the status of Mr. Geiger's claims is not clear, *see* Jt. Status Report filed March 21, 2005 at 31, including the listing of Mr. Geiger in a record of plaintiffs who apparently have outstanding claims in this case.

**4.** Because *Adams I*, 27 Fed.Cl. at 11–17, provided a thorough analysis of the administrative exemption regulatory scheme, an analysis which was not disturbed by the Federal Circuit's reversal in *Adams II*, the court will not reiterate that analysis here.

**5.** The fourth criteria listed in (d) is not applicable to GS–13 service or to the motion under consideration.

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

(c) *Discretion and independent judgment test.* The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

5 C.F.R. § 551.206 (2005). Thus, there are three criteria which must all be met to make these six plaintiffs exempt from FLSA overtime provisions: (a) the primary duty test, (b) the nonmanual work test and (c) the discretion and independent judgment test. *Id.; Adams I,* 27 Fed.Cl. at 12–13.

■ The term "primary duty" has been defined and interpreted to cover two scenarios, the first when the primary duty for exemption purposes describes what the employee does for greater than fifty percent of his or her work, and the second when the primary duty for exemption purposes is actually performed less than fifty percent of the time but meets three supplemental criteria:

> [An employee's primary duty is] "that which constitutes the major part (over 50 %) of the employee's work. However, a duty which constitutes less than 50% of the work can be credited as the primary duty for exemption purposes *provided* that duty: (1) constitutes a substantial, regular part of a position, and (2) governs the classification and qualification requirements of the position, and (3) is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made."

*Adams I,* 27 Fed.Cl. at 13 (quoting Attachment to Federal Personnel Management (FPM) Letter No. 551–7 at 5–6 (July 1, 1975) (*as modified by* FPM Letter No. 551–13 at 1, and Attachment at 1 (Feb. 21, 1978))). The court in *Adams I* defined the primary duty test for the second type of situation as the "alternative primary duty test." *Id.* at 13–14. For an employer who does not or cannot prove that the employee's allegedly administrative primary duty is the major part of his or her work, the alternative primary duty test provides an alternate means of validating the administrative exemption. However, the alternative primary duty test also adds three supplemental criteria to the basic criteria required by section 551.206, supplemental criteria referred to by the Federal Circuit in *Adams II* as the three prongs of the alternative primary duty test. 1998 WL 804552, at *4. The Federal Circuit in *Adams II* reversed the summary judgment ruling in favor of defendant in *Adams I* not for failure to meet the criteria in section 551.206, but for failing to meet the supplemental criteria of the three prongs of the alternative primary duty test. *Id.*

## III. The Law of the Case as to the Primary Duty Test

The parties vigorously dispute whether or not defendant has recourse to just the alternative primary duty test to prove the administrative exemption of these six plaintiffs, or whether defendant may also proceed by way of the "majority" primary duty test—that is, by establishing that duties administrative in nature occupied over fifty percent of the plaintiff's work time and also satisfying the other two tests of section 551.206 as to nonmanual work in addition to discretion and independent judgment. *See, e.g.,* Def.'s Cross–Mot. at 34 (offering evidence to satisfy the "majority" test and stating that "we need not rely upon the alternative primary duty test"); Pls.' Opp. at 6 (stating that "defendant now mistakenly asserts that it is entitled to prove that duties that defendant claims are within FLSA's administrative exemption occupied more than 50% of the working time of nine individual plaintiffs"). Plaintiffs' argument is that the law of the case limits defendant to only the alternative primary duty test. Pls.' Opp. at 5 (stating that "this [c]ourt declared that defendant's evidentiary burden required it to satisfy APDT [alternative primary duty test] *in full*"). The court disagrees with this argument, because nothing in the procedural history of this case now limits defendant to just the alternative primary duty test in its efforts to prove an administrative exemption for these six plaintiffs. The applicable regulations allow either method, and neither the Federal Circuit nor this court have forbidden the use of the "majority" test.

In *Adams I*, Judge Tidwell made no factual findings as to whether the "majority" test could be satisfied at some future summary judgment procedural juncture as to these plaintiffs, and made no categorical statement as to whether the record before him did not satisfy the "majority" test. *See, e.g.*, 27 Fed. Cl. at 18 (while discussing GS–12 BATF criminal investigators, stating that "[t]he fact that the managerial primary duties *may* occupy less than 51% of the investigator's time is irrelevant") (emphasis added); *id.* at 20 (making a similar conclusion about GS–12 DEA criminal investigators, stating that a managerial duty "may consume less than 51% of the investigator's work time"). Judge Tidwell's opinion does not comment at any point as to whether GS–13 criminal investigators had administrative duties as the major part, or greater than fifty percent, of their work. Instead, Judge Tidwell granted summary judgment for defendant on claims, including those of these six plaintiffs (and many others), based on the alternative primary duty test. On appeal, it was the summary judgment based on the alternative primary duty test which was overturned. *Adams II*, 1998 WL 804552, at *4.

In *Adams II*, the Federal Circuit stated that "the alternative primary duty test is *a* proper standard for determining whether the appellants are exempt from the overtime requirements of the FLSA." *Id.* (emphasis added). The Federal Circuit did not comment on the "majority" primary duty test, which is clearly allowed by regulation, where the definition of primary duty is now codified at 5 C.F.R. § 551.104 (2005). The Federal Circuit merely stated that "determination [of an administrative exemption through the alternative primary duty test] must await further evidentiary development." *Adams II*, 1998 WL 804552, at *4. As to defendant's burden on remand, the Federal Circuit pointed out that "the government will be required to present evidence of the appellants' actual duties and the extent to which they were engaged in those duties." *Id.* at *5. That evidence would be required for either the "majority" primary duty test or the alternative primary duty test.

Plaintiffs' best argument that this court has foreclosed defendant from proving the administrative exemption using the "majority" primary duty test is that in a 2000 discovery ruling this court commented solely on defendant's burden under the alternative primary duty test and did not mention defendant's burden under the "majority" primary duty test. But a careful reading of that order does not indicate that the court was limiting the scope of defendant's discovery to evidence related to the alternative primary duty test; rather, the court was indicating why, over plaintiffs' objection, defendant might need the sought-after discovery in order to meet its burden under the alternative primary duty test. Order of December 13, 2000 at 6–7 (holding that documents which might satisfy defendant's burden under the alternative primary duty test were indeed relevant). In that order, the court also commented that on the record before Judge Tidwell, the "majority" primary duty test had not been satisfied "outright." This comment does not constitute a fact finding regarding the "majority" primary duty test, but a simple acknowledgment that the record before Judge Tidwell in *Adams I* permitted no determination under the "majority" primary duty test. A further comment by the court in that order stated that "[i]n the absence of any evidence that plaintiffs might be FLSA exempt under any other applicable law, this court will view defendant's burden of proof in light of the Federal Circuit opinion." A proper reading of this comment is that the Federal Circuit discussed in detail the requirements of the alternative primary duty test, and this discussion informed this court of how defendant might prove an exemption under the alternative primary duty test. But the sentence also permits defendant to offer evidence of a valid administrative exemption "under any other applicable law," for example, under the "majority" primary duty test.

In *Adams III*, issued after the parties had completed briefing on the cross-motion at issue here, the court again commented on the two primary duty tests, and mentioned that the result in that opinion would be the same under either test. *Adams III*, No. 90–162C and Consolidated Cases, slip op. at 19. The court also commented that it would not allow

the parties to relitigate any findings regarding the primary duty test, but as the court has discussed *supra*, there have been no findings regarding the primary duty test to date. The slate is clean for proof of an administrative exemption using the "majority" primary duty test. Because the level of evidence presented by defendant for all claims (except the nine plaintiffs) was insufficient to resist summary judgment under either test, the court's comment that it would "focus" its inquiry on the alternative primary duty test, following the lead of the Federal Circuit, simply means that between the two methods of proving the exemption, this court chose to discuss in detail the method previously focused upon by both this court's prior decision and the Federal Circuit.

The law of the case doctrine insists that a trial court follow, on remand, factual findings from a prior proceeding that have been incorporated into an appellate decision. *Exxon Corp. v. United States,* 931 F.2d 874, 877–78 (Fed.Cir.1991). However, a successor judge is not bound by a prior judge's fact findings that were not incorporated into the appellate decision. *Id.* at 878. Similarly, a trial judge is not bound by his or her own prior rulings, if they have not been adopted by an appellate court. *Id.* Here, there were no fact findings by Judge Tidwell as to the "majority" primary duty test for these plaintiffs. And after remand, the undersigned judge has made no fact findings regarding the "majority" primary duty test. There is no law of the case excluding the "majority" primary duty test for defendant's cross-motion regarding the overtime status of these six plaintiffs under FLSA.

## DISCUSSION

### I. Standard of Review

This action is before the court on defendant's cross-motion for partial summary judgment. The availability of summary judgment helps a federal court " 'to secure the just, speedy, and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it would affect the outcome of the suit. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party bears the burden of showing that there is an absence of any genuine issue of material fact. *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994) (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). All doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed. Cir.1987).

The non-moving party, however, has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Mingus,* 812 F.2d at 1390–91; *see also Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835–36 (Fed.Cir.1984) (in making a determination as to whether genuine issues of material fact exist, the court is not to accept a party's bare assertion that a fact is in dispute). "The party opposing the motion must point to an evidentiary conflict created on the record by at least a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag,* 731 F.2d at 836. Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

Thus, there are several possible outcomes for the remaining claims of the six plaintiffs

carved out by defendant's cross-motion from the general body of GS–13 claimants in plaintiffs' motion for partial summary judgment. If defendant offers evidence of a valid administrative exemption to FLSA overtime requirements and plaintiffs fail to raise a genuine issue of material fact, summary judgment will be entered and that plaintiff's claims will be dismissed. Or, defendant may offer evidence of a valid administrative exemption but plaintiffs will have substantiated a genuine issue of material fact—in that scenario summary judgment will not be granted and that plaintiff's claims will remain to be resolved by trial or by settlement. Finally, if defendant's evidence of an administrative exemption is lacking a mandatory element of proof, or fails to address a period of employment that underlies a portion of that plaintiff's claims, summary judgment will not be granted to defendant for the claims for which defendant is not entitled to judgment as a matter of law. In that instance, plaintiffs' April 26, 2002 motion for partial summary will be granted for those claims for which defendant's allegations of proof are deficient, because, as stated in this court's opinion in *Adams III*, No. 90–162C and Consolidated Cases, slip op. at 27, defendant bears the burden of proof to overcome a presumption against applying the administrative exemption under FLSA.

## II. Administrative Exemption Analysis

■ Before turning to the individual claims of the six plaintiffs, the court reviews defendant's burden of proof as it relates to a March 17, 1992 stipulation of facts by the parties.[6] Defendant may prove a valid administrative exemption for these plaintiffs under either the "majority" primary duty test or the alternative primary duty test. Under the "majority" primary duty test, defendant must identify administrative duties that constitute over fifty percent of the plaintiff's work, and demonstrate that these duties are nonmanual and require discretion and independent judgment, according to the tests set forth in 5 C.F.R. § 551.206. Under the alternative primary duty test (APDT), defendant must first satisfy the three prongs of

the APDT identified by the Federal Circuit in *Adams II*, so that these administrative duties which may not be the major part of the work duties are nonetheless substantial and regular duties of the position, govern the classification and qualification requirements of the position, and are clearly exempt duties in terms of their basic nature, the frequency of the exercise of discretion and independent judgment, and the significance of the decisions made. *See* 5 C.F.R. § 551.104. The basic criteria of section 551.206 must also be met, including an element not found in the three prongs of the alternative primary duty test, the criteria concerning nonmanual work.

Because the "majority" primary duty test may be used where the major part of the plaintiff's duties is established, the court will review this aspect of defendant's evidence first in each instance. The court will examine defendant's proffered evidence that purports to show what duties plaintiff performed for more than fifty percent of his or her work responsibilities, and will determine whether plaintiffs have raised a genuine issue of material fact as to defendant's alleged proof of the major part of that particular plaintiff's work duties. Of some importance in this inquiry is the parties' stipulation of March 17, 1992 which stated that plaintiffs "have spent at least 51% of their working time performing criminal investigative duties[, or] ... performing either criminal investigative duties or protective duties or a combination thereof, or related duties, in the case of USSS." Mar. 17, 1992 Stip. ¶¶ 15–16. The March 17, 1992 Stipulation is limited to plaintiffs who held positions governed by certain position descriptions attached to the stipulation. Mar. 17, 1992 Stip. ¶¶ 15–16, Jt. Exs. 1–22. The court notes that one plaintiff at issue here, Robert A. Reid, became part of these consolidated cases in 1994 and was not a party to this stipulation.

Plaintiffs attempt to use the March 17, 1992 Stipulation to their advantage, and cite Judge Tidwell in *Adams I* as support for their premise that investigative work is not exempt administrative work. *See* Pls.' Opp.

---

6. A more complete discussion of the import of this stipulation may be found in *Adams III*, No. 90–162C and Consolidated Cases, slip op. at 19–21.

at 23 ("This Court held for plaintiffs that criminal investigation did not meet the administrative exemption."). Plaintiffs more accurately cite the record for the proposition that "the Court held what it considered to be 'pure investigative work' to be non-exempt 'production work.'" Pls.' Mot. at 8 (citing *Adams I*, 27 Fed.Cl. at 18). However, the best summation of Judge Tidwell's holding as to whether criminal investigative work is exempt administrative work is found elsewhere is *Adams I*:

> The court agrees that finding criminal investigative work to be *per se* administrative work would negate [29 U.S.C.] § 207(k). Yet to find that § 207(k) law enforcement work can never be administrative work would be equally wrong. Were this court to find—and it does not—that performing criminal investigative work requires an employee to be sheltered from [29 U.S.C.] § 213(a)(1) under § 207(k), then the administrative, executive, and professional exemptions of § 213 would be meaningless for all positions labelled "criminal investigator," regardless of the work actually performed by the employee. In fact, [the] O[ffice of] P[ersonnel] M[anagment] indicated that § 213(a)(1) is to be applied first, to screen out administrative employees from FLSA's overtime provisions. Attachment to FPM Letter No. 551–5, at 6 (Jan. 15, 1975). Only then is an agency to apply § 207(k) to non-exempt employees engaged in law enforcement activities in order to determine the amount of their overtime compensation. *Id.*
>
> In giving full meaning to both § 207(k) and § 213(a)(1), it is necessary to examine the actual work performed by plaintiffs, not simply the general category of their positions. OPM indicated that an employee's classification title is not determinative of his or her exemption status. Attachment to FPM Letter No. 551–7 at 2 (July 1, 1975) ("Determinations as to the exempt or nonexempt status of a position ultimately rest on the actual duties of the position."); *see also* 29 C.F.R. § 541.201(b) (1992). In

practical terms, the court must examine the attributes of the position descriptions before it to determine whether or not § 213(a)(1) screens plaintiffs out of FLSA overtime coverage.

27 Fed.Cl. at 11–12. Thus, the parties' stipulation as to criminal investigation work constituting fifty-one percent or more of certain plaintiffs' work duties is not dispositive of the motion before the court, because this court has not held that criminal investigative work is not administrative work.

If defendant successfully crosses the threshold of establishing the major part of a plaintiff's work duties, the next issue is whether the evidence of the primary duty matches one of the types of administrative work in 5 C.F.R. § 551.206(a), either "(1) Significantly affects the formulation or execution of management policies or programs; or (2) Involves general management or business functions or supporting services of substantial importance to the organization serviced."[7] If so, the court would then determine whether the nonmanual work test and the discretion and independent judgment test have been met. If defendant is not successful in establishing the major part of a plaintiff's work duties, the court would examine the evidence to see if the three prongs of the alternative primary duty test, or APDT, have been met, as well as the basic criteria of section 551.206.

One of the most helpful distinctions that can be drawn between the administrative work described in section 551.206(a)(1) and other non-exempt work is that of "management functions" versus "production" work. *Adams I*, 27 Fed.Cl. at 14. Although this distinction is not simple to apply to an employee's primary work duty, the extensive discussion of this distinction in *Adams I, id.,* undisturbed by the Federal Circuit in *Adams II,* informs the court's analysis of section 551.206(a)(1). The analysis of 551.206(a)(2) in *Adams I*, 27 Fed.Cl. at 14–16, is also undisturbed by the Federal Circuit and helpful. Supporting service is distinguished from

---

7. The third type of administrative primary duty described in 5 C.F.R. § 551.206(a)(3) is not at issue here. *Adams I*, 27 Fed.Cl. at 12 n. 5.

production work in that it is substantially important work that impacts the effectiveness of the organization. *Id.* at 14–15 (citing Attachment to FPM Letter No. 551–7 at 9). Examples of supporting services include:

> providing support to line managers through: (1) expert advice in a specialized subject matter, such as that provided by management consultants or systems analysts; or (2) assuming aspects of overall management function in such areas as safety, personnel, or finance; or (3) representing management in business functions such as negotiating or administering contracts; or (4) providing supporting services, such as automated data processing.

*Id.* The court in *Adams I* also extensively discussed the nonmanual work test as well as the discretion and independent judgment test, found in sections 551.206(b) and 551.206(c), respectively. *Id.* at 16–17. This analysis also was undisturbed by the Federal Circuit and provides guidance to the court. Where the legal analysis in *Adams I* has been further elucidated by other cases pertinent to the primary work duties here, this caselaw will also be applied to the evidence presented by the parties.

### III. Claims of the Six Plaintiffs

#### A. The GS–13 Claims of Jose A. Grossett

Mr. Grossett filed his claim on March 21, 1991 and seeks back pay from May 22, 1989 through July 15, 1990, while he was a GS–13 1811 at the IRS. His position description for this period was one of those attached to the March 17, 1992 Stipulation; thus, the parties have stipulated that during this period Mr. Grossett spent at least fifty-one percent of his work time on criminal investigative duties. His period of GS–13 1811 service at the IRS was divided into two distinct assignments: from May 22, 1989 until about December 1989 he was "in the field," and from January 1990 until July 15, 1990 he was detailed as a program manager/program analyst. Def.'s App. at 180, 186. The court will address these two periods of service in turn.

■ Two conflicting statements from Mr. Grossett were presented to the court regarding his work in the field. In his deposition,

Mr. Grossett stated that he spent eighty percent of his time in the field "developing recommendations to . . . management of IRS concerning whether and how investigative staffing should be devoted to particular matters or otherwise to take action with respect to particular areas of non-compliance with laws enforced by [the IRS]." Def.'s App. at 186. In a declaration signed three years later, Mr. Grossett asserted that "[i]n fact, I spent 80 to 90 percent of my work time from 1988 up until approximately January 1990 conducting the grand jury investigation . . . . Of that time, at least ninety-five percent of it was spent performing typical criminal investigative tasks such as conducting interviews, reviewing documents, preparing paperwork for enforcement actions, and meeting with the Assistant U.S. Attorney." Pls.' App. at 510. Because of the conflicting nature of these statements, defendant has not established what duties constituted the major part of Mr. Grossett's work during his GS–13 time in the field, because at this summary judgment juncture the court does not weigh evidence but simply notes that a genuine issue of material fact exists.

Nor has defendant established that Mr. Grossett's administrative duties in the field meet the alternative primary duty test. Defendant presented no evidence, for example, as to how Mr. Grossett's allegedly administrative work in the field governed the classification and qualifications requirements of his position, the second prong of the APDT. The court need go no further. Mr. Grossett's GS–13 service in the field from May 22, 1989 until about December 1989 was not proved by defendant to be exempt, and summary judgment must be denied for this period of service. Because genuine issues of material fact exist, the court will grant neither defendant's nor plaintiffs' summary judgment motions as to Mr. Grossett's back pay claims for GS–13 service in the field.

■ Mr. Grossett was a GS–13 program manager/program analyst from approximately January 1990 until July 15, 1990. In that role, Mr. Grossett was assigned to the assistant regional commissioner staff and was assigned to the asset forfeiture program or

Organized Crime Drug Enforcement Task Force (OCDETF). Describing his role in that position, Mr. Grossett stated:

My function was to flesh out problems or situations to bring to the attention of the assistant regional commissioner with recommendations based on my field experience or experience that I could glean from speaking to managers in the field. Basically I was the eyes and ears as well as the person who would try to develop new ways to go, whatever that might be.

Def.'s App. at 181. He also indicated that 100 percent of his time as a program manager/program analyst involved "developing recommendations to ... management of IRS concerning whether and how investigative staffing should be devoted to particular matters or otherwise to take action with respect to particular areas of non-compliance with laws enforced by [the IRS]." *Id.* at 186.

Mr. Grossett's deposition testimony about the general nature of the major part of his work as a program manager/program analyst was not contradicted by later statements, but rather was fleshed out with additional detail. His declaration outlined his "four separate duties" in this role: "compiling statistics, conducting peer reviews, reviewing grand jury requests, and reviewing asset forfeiture requests and administrative files." Pls.' App. at 510. Defendant has established the major part of Mr. Grossett's work, his primary duty, during this time. His primary duty also squarely fits within the supporting services category of administrative duties of section 551.206(a)(2). His analyst functions were not the production work of investigations, but rather contributed to the effectiveness of these investigations by guiding management in its decisions as to how to allocate staff resources.[8]

Mr. Grossett's work as a program manager/program analyst also was nonmanual, in that it was desk-bound, white-collar work. *Adams I,* 27 Fed.Cl. at 16; *Adam v. United States,* 26 Cl.Ct. 782, 793 (1992). His work also meets the other criteria in

section 551.206(b)(2), because it was "specialized or technical [in] nature [and] require[d] considerable special training, experience and knowledge," *id.* Mr. Grossett's duties included responding to field requests concerning the sufficiency of evidence for grand juries, for example. Pls.' App. at 511. Defendant has shown that Mr. Grossett's service during this assignment met the nonmanual work test.

Finally, Mr. Grossett "frequently exercise[d] discretion and independent judgment, under only general supervision," as described in section 551.206(c). Three out of the four separate duties of his position required discretionary decision-making and independent judgment, as described in FPM Letter No. 551–7, quoted in *Adams I:*

(1) the work must involve sufficient variables as to require applying discretion; (2) the employee must have had authority to make the decision during the course of the assignment; with review of his or her decision following later; and (3) the decision must be independently significant.

27 Fed.Cl. at 17. Mr. Grossett's deposition testimony showed that he had only general supervision while working as a program manager/program analyst, because he "was, if you will, part of management doing what managers do." Def.'s App. at 187. Defendant has shown that Mr. Grossett's GS–13 service in this role met the discretion and independent judgment test as well.

Because plaintiffs did not raise a genuine issue of material fact in this regard, Mr. Grossett's GS–13 service from approximately January 1990 until July 15, 1990 was exempt from FLSA overtime requirements because of a valid administrative exemption. Summary judgment is granted to defendant for this portion of Mr. Grossett's GS–13 back pay claims.

### B. The GS–13 Claims of J. Lawrence Cunningham

Mr. Cunningham filed his claim on March 14, 1990 and seeks FLSA back pay

---

8. Although this finding regarding Mr. Grossett's primary duty might initially appear to contradict the March 17, 1992 stipulation that he spent at least fifty-one percent of this time investigating, his time in the relevant position description included more field time than manager/analyst time. Therefore, this finding concerning less than seven months of his more than fourteen months of service as a GS–13 is not inconsistent with the parties' stipulation.

from March 14, 1987 through February 19, 1991,[9] while he was a GS–13 1811 resident agent at USSS in San Jose, California. Pls.' Opp. at 49 n. 39; Def.'s Cross–Mot. at 35; Def.'s App. at 201. Because the court has found that a two-year statute of limitations applied to the other GS–13 FLSA claims at the five concerned agencies, *Adams III*, No. 90–162C and Consolidated Cases, slip op. at 40, for the same reasons discussed in that opinion the court finds that a two-year statute of limitations applies to the claims of Mr. Cunningham. Therefore, the relevant period of service for Mr. Cunningham's GS–13 claims is from March 14, 1988 through February 19, 1991.

Defendant argues that Mr. Cunningham's primary duty consisted of supporting services and managerial tasks. The government also contends that the evidence demonstrates that Mr. Cunningham's work was predominantly intellectual and nonmanual in nature and required the exercise of discretion and independent judgment under only general supervision. In response, plaintiffs argue that the government does not establish with particularity that Mr. Cunningham's duties satisfy each of the exemption criteria and that Mr. Cunningham's work is production work rather than support inasmuch as he engaged in duties that were in the furtherance of the Secret Service's mission. For the reasons discussed below, the court finds that defendant has proved that Mr. Cunningham's GS–13 service was exempt administrative work.

The first issue is whether defendant established the major part of Mr. Cunningham's work duties, or his primary duty. Plaintiffs did not argue that Mr. Cunningham's position description was covered by the March 17, 1992 stipulation, so the court need not infer that Mr. Cunningham's GS–13 service was subject to that stipulation. Even if Mr. Cunningham's service was referenced in that stipulation, the language of that stipulation, as it pertains to USSS, is very broad:

While plaintiffs have been employed by USSS under the position descriptions attached … they have spent at least 51% of their working time performing either criminal investigative duties or protective duties or a combination thereof, or related duties.

Mar. 17, 1992 Stip. ¶ 16. The court notes that "related duties" is a general term that could encompass either production work, supporting services or managerial duties. Defendant relied on Mr. Cunningham's responses to interrogatories, Def.'s App. at 193–97, and a personnel update sheet dated June 29, 1989, *id.* at 201–02, to establish that more than fifty percent of his work was administrative in nature. The court is satisfied that despite some mathematical quirks (one interrogatory response lists work components that total to 105% of work time), the evidence establishes the major part of Mr. Cunningham's duties, as described in detail below.

When asked to describe the duties that occupied the majority of his work time from March 13, 1987 through February 20, 1991, Mr. Cunningham stated:

Plaintiff was responsible for supervising personnel. He interceded in work related problems, provided mentoring for newly assigned special agents as well as journeymen agents and arranged for staff training. Plaintiff assessed the work load of the office and based upon exigencies and other circumstances, prioritized the tasks accordingly.

Plaintiff was responsible for planning and coordinating all criminal investigative cases as well as the protective security arrangements for visiting heads of state and other dignitaries to the San Jose District. This entailed formulating detailed security plans with viable emergency contingencies involving other agencies. These efforts required manpower and logistical arrangements as well. . . .

9. Although the plaintiffs' complaints in these consolidated cases did not initially specify an end date to the period of service for which they were seeking back pay, as litigation progressed these end dates have become fixed, either by promotions of particular plaintiffs out of the positions claimed to be FLSA non-exempt, by intervening legislation, by settlement, or by other circumstances. Plaintiffs' brief states that Mr. Cunningham's claims are limited to the period ending February 19, 1991.

Protective duties included coordinating and supervising the protective advance teams and structuring the interface with local and federal law enforcement officials. . . .

Plaintiff's duties also included reviewing all official reports and mail, evidence verification (on current cases), counterfeit note review, monitoring ongoing investigations, liaison with various headquarters divisions and ensuring the office's operational efficiency.

Def.'s App. at 196–97.

This answer to the government's interrogatory indicates that Mr. Cunningham engaged in some supporting services, such as "assuming aspects of overall management function in such areas as safety, personnel, or finance." *See Adams*, 27 Fed.Cl. at 15. Further detail was provided by Mr. Cunningham in a personnel update form, whose contents he confirmed were "not inaccurate or misleading," to the best of his recollection. Def.'s App. at 193.

The personnel form describes Mr. Cunningham's experience, training and achievements in Secret Service assignments during the year prior to June 1989:

**Protection** Coordinated all advances and maintained liaison with the hierarchy of the local law enforcement community for all protective visits to the San Jose district. . . . Other supervisory experience includes lead advance duties for the Papal visit to Monterey in 1987.

**Counterfeit** As the RA, supervisory duties include the daily administrative responsibility of all counterfeit investigations. This includes review of all reports and notes received, assignment of investigations, and the implementation of undercover operations as needed. I provide direction and support to the other 4 agents assigned to the RA with on-going cases. . . .

**Fraud and Forgery** As the RA, I develop, assign, and direct fraud and forgery investigations. This includes the implementation of a variety of investigative techniques (including undercover operations), preparation of indictments, and the execution of search warrants. Administratively this involves decisions regarding the opening and closing of cases, reviewing prepared memorandum reports, and the management of large caches of evidence. Three of the four agents assigned to the RA have a significant fraud and forgery case load. . . .

**Intelligence** The San Jose district has a significant intelligence workload. In the past year, the RA made 20 PI arrests and managed at least 1 Class 3 subject (unconfined). I assign, coordinate, and oversee all cases and ID advances. Supervisory duties include the approval of all reports and teletypes leaving the office and provide direction for the 4 other agents in the management of their cases.

Other duties include active participation on numerous law enforcement executive boards and local intelligence task force groups in the San Jose district.

Def.'s App. at 201–02.

The above recitation reflects the fact that Mr. Cunningham participated in overall management functions during the year prior to the signing of the Special Agent Qualification Statement (June 29, 1989). Many of these duties are clearly administrative duties as defined by section 551.206(a)(1), because they are staff functions as opposed to line functions, *Adams I*, 27 Fed.Cl. at 14. Mr. Cunningham's answers to interrogatories regarding the percentage of time he spent performing the duties set forth in the personnel form indicate that Mr. Cunningham spent the majority of his time during the relevant period performing administrative duties, either supporting services or managing programs. With respect to the period from March 13, 1987 through June 29, 1989, Mr. Cunningham states that he spent thirty percent of his time performing the supervisory duties referenced in the "Counterfeit" section of the statement; fifteen percent of his time providing direction and support to other agents; fifteen percent of his time making decisions regarding the opening and closing of cases, reviewing reports, and managing caches of evidence; and twenty percent of his time assigning, coordinating, and overseeing cases and ID advances as stated in the "Intelligence" portion of the statement. Def.'s App. at 194. Thus, from March 13,

1987 through June 29, 1989, Mr. Cunningham spent more than fifty-one percent of his time performing duties that were overall management functions making program decisions and supervising personnel.

With respect to the period from June 30, 1989 through February 20, 1991, Mr. Cunningham stated that he spent forty percent of his time performing the supervisory duties referenced in the "Counterfeit" section of the statement; twenty percent of his time providing direction and support to other agents; twenty percent of his time making decisions regarding the opening and closing of cases, reviewing reports, and managing caches of evidence; and twenty-five percent of his time performing supervisory duties of the kind referenced in the "Intelligence" portion of the statement. Def.'s App. at 195. This statement shows that Mr. Cunningham spent more than fifty-one percent of his duties performing administrative duties from June 30, 1989 through February 20, 1991. Thus, for all relevant periods of Mr. Cunningham's GS–13 service, his work meets the primary duty test of section 551.206(a). The court also finds that his work was nonmanual because it was white-collar, specialized work that required considerable training, experience and knowledge, satisfying the nonmanual work test of section 551.206(b). Mr. Cunningham's work, as described by all of the evidence presented by the parties, also required discretion and independent judgment and was under only general supervision, satisfying the test in section 551.206(c).

Plaintiffs produced no evidence to raise a genuine issue of material fact with respect to defendant's proof of Mr. Cunningham's administrative exemption. Plaintiffs simply offered a conclusory statement that much of his work was production work. Defendant has shown that Mr. Cunningham's GS–13 service was FLSA exempt under the tests now codified at 5 C.F.R. § 551.206. Consequently, the court grants defendant's cross-motion for partial summary judgment with respect to Mr. Cunningham's GS–13 claims.

C. **The GS–13 Claims of Lawrence J. Sams**

■ Mr. Sams filed his claims on May 25, 1990. Def.'s Cross–Mot. at 36. Mr. Sams'

remaining claims for overtime back pay cover the period from January 1989, when, while working at USCS, he became a GS–13 1811, until October 1994, when FLSA was no longer applicable to him. Pls.' Opp. at 46 n. 36. Defendant presented evidence concerning Mr. Sams' duties from January 1989 through July 1992. Def.'s Cross–Mot. at 36–37. Because no evidence is before the court regarding Mr. Sams' duties from August 1992 through October 1994, defendant has not shown that Mr. Sams was exempt from FLSA overtime provisions for that period of time, and defendant's cross-motion is denied as to the August 1992 through October 1994 period of Mr. Sams' GS–13 service. Plaintiffs' motion for partial summary judgment is granted for Mr. Sams' claims for back pay from August 1992 through October 1994.

The government contends that Mr. Sams was exempt from January 1989 through July 1992 when he worked as a GS–13 Senior Special Agent/Desk Officer with the Strategic Investigations Division (SID) of USCS. Mr. Sams' position was described in a position description attached to the parties' March 17, 1992 Stipulation, so the stipulation applies to his GS–13 1811 service. Pls.' Opp. at 46 n. 36; Mar. 17, 1992 Stip. Ex. 22. The court must take into account the stipulated fact that Mr. Sams spent at least fifty-one percent of his working time in his GS–13 1811 position performing criminal investigative duties when considering defendant's proof of Mr. Sams' primary duty.

The parties present three types of evidence of Mr. Sams' duties during the January 1989 through July 1992 period. Defendant relies principally upon a promotion application dating from approximately the end of this period, Def.'s App. at 212–21, and upon answers to interrogatories concerning this promotion application and the tasks described therein, *id.* at 203–09. Plaintiffs rely principally upon a more recent declaration by Mr. Sams. Pls.' App. at 552–54. Despite differences of interpretation as to the significance of various tasks and responsibilities fulfilled by Mr. Sams during this period, the description of the basic breakdown of work duties remained

consistent throughout the three categories of evidence. The court reports here a summation of Mr. Sams' duties during this period:

Ten percent of his time was spent directing the national "Flash" Weapons and Equipment Program;

Thirty percent of his time was spent directing the National Export License Request Program for the SID;

Five percent of his time was spent directing efforts by the SID to protect the Customs Service's designation as lead investigatory agency from challenge by other agencies;

Five percent of his time was spent serving as the Office of Enforcement representative to Operation CHEMCON II, the Customs delegate to the Chemical Action Task Force, and/or the principal advisor to the Munitions Branch concerning implementation of export enforcement initiatives;

Ten percent of his time was spent preparing replies to congressional inquiries;

Thirty percent of his time was spent writing briefing materials for the Commissioner or the Assistant Commissioner, Office of Enforcem

Ten percent of his time was spent reviewing petitions for reinstatement of export licenses.

Def.'s App. 205–07. Defendant has established the major part of Mr. Sams' work duties during this period.

Although it is not immediately discernable whether this breakdown of job duties contradicts the stipulated fact that Mr. Sams spent at least fifty-one percent of his time on criminal investigative duties while in a position covered by description # 6034, Mar. 17, 1992 Stip. Ex. 22, the court notes that only forty-five percent of the listed duties are clearly not investigative in any respect—preparing materials for congressional hearings and protecting Customs' lead agency role. Also, it

should be noted that there are more than two years of service under position description # 6034 which are not included in the above list, which could be primarily investigative years of service. Thus, there is no contradiction between the facts presented by the parties, which might, as discussed *supra*, include criminal investigative duties of an administrative nature, and the stipulated fact concerning fifty-one percent of Mr. Sams' working time.

The next question is whether more than fifty percent of Mr. Sams' work was administrative, so as to satisfy the primary duty test of section 551.206(a). Defendant has presented a clear picture that Mr. Sams' primary duties constituted supporting service or managerial work, rather than production work. In addition to the forty-five percent of his job that was clearly not investigation work, another sizeable responsibility, perhaps as much as forty-five percent of his work, was spent either directing programs or acting as liaison between programs. Mr. Sams' declaration might permit an inference that less than forty-five percent of his time was spent on program administration and liaison work,[10] but nothing in Mr. Sams' declaration suggests that the percentage of work duties that were clearly supporting services or managerial in nature were less than the major part of Mr. Sams' job during this period.

Mr. Sams' primary duty as a Senior Special Agent/Desk Officer was to provide support to Customs in its relations with Congress, support to agents in the field by procuring information and necessary supplies, program management, and coordination of resources with other agencies in task forces. These tasks fit squarely within the administrative duties described by section 551.206(a)(1)-(2). Defendant has proved that Mr. Sams met the primary duty test during this period. There is also no doubt that his desk-bound, white-collar

10. In particular, Mr. Sams notes that he was not responsible for the National Export License Request Program for the entire period. This does not contradict his interrogatory answer that thirty percent of his time from January 1989 through July 1992 was spent on that program. Def.'s App. at 205–06, 208. At most, it might indicate that his earlier estimate was too high, if indeed his answer did not take into account that his program responsibilities for the National Export License Request Program were of a briefer duration than the period covered by the interrogatory. His declaration did not clarify this issue or dispute the thirty percent estimate.

specialized work required considerable experience and knowledge, qualifications acquired by Mr. Sams during eleven years of experience as a customs officer before getting this position with the SID. Def.'s App. at 221. Mr. Sams' GS–13 service between January 1989 and July 1992 satisfies the nonmanual work test of section 551.206(b).

Finally, the evidence tells two slightly different versions of Mr. Sams' decision-making in his role as Senior Special Agent/Desk Officer at the SID. The promotion application extolls his accomplishments, which included developing innovative national directives, streamlining processes and making recommendations regarding export license reinstatement petitions. Def.'s App. at 212–13. His declaration, however, emphasized the routine aspects of his role. Pls.' App. at 553–54. Nevertheless, Mr. Sams' declaration leaves intact and undisputed the examples of his exercise of discretion and independent judgment described in his promotion application, and from these the court is convinced that Mr. Sams exercised independent judgment frequently, and under only general supervision. His recommendations and innovations were of the type that go beyond routine decisions regarding the procedural details of his own work, and clearly meet the test of section 551.206(c).

Because defendant has shown that Mr. Sams' GS–13 service from January 1989 through July 1992 was exempt from FLSA overtime requirements, defendant's cross-motion for partial summary judgment is granted as to this period of his service.

### D. The GS–13 Claims of Michael A. Lee

 Mr. Lee filed his claim on February 23, 1990 and seeks overtime back pay from March 1991 through October 1994, while he was a GS–13 1811 criminal investigator at USSS. Def.'s Cross–Mot. at 37; Pls.' Opp. at 48 n. 38. Defendant presented evidence in support of its argument that Mr. Lee was exempt from FLSA overtime provisions when he served as a GS–13 program manager for the Secret Service Counter Assault Team (CAT) from March 1991 through November 1993. Because defendant presented no evidence for the period of December 1993 through October 1994, when Mr. Lee was assigned to the presidential protective division, Def.'s App. at 224, defendant's cross-motion for partial summary judgment is denied as to Mr. Lee's overtime claims for December 1993 through October 1994. Plaintiffs' motion for partial summary judgment is granted for Mr. Lee's claims for December 1993 through October 1994.

In a Special Agent Qualification Statement submitted by Mr. Lee in 1997 for a promotion from GS–13 to GS–14, Mr. Lee listed the tasks he performed as the program manager for the CAT training section:

Supervised four Uniformed Division Officers and on[e] Special Agent.

Coordinated and taught tactical and firearm training for the Counter Assault teams.

Developed new training guidelines and tactics for C.A.T.

Supervised Research and Development of new equipment.

Obtained outside training venues for C.A.T. which are currently used.

Liaison with Local, Federal and Military Tactical units.

In this capacity, exercised procurement and purchase authority for the training division.

Reviewed all administrative paper work and procedures.

Traveled to other federal and local law enforcement facilities, to advise on tactical planning and procedures.

Def.'s App. at 240. In his deposition, Mr. Lee confirmed that he performed the above activities. *Id.* at 225–33. He further testified that during the period that he was with the training division he spent forty percent of his time developing new training guidelines, less than forty percent of his time actually teaching or performing firearms training, and between ten and fifteen percent of his time performing training coordination activities. *Id.* at 229. Defendant has established

the major part, or primary duty, of Mr. Lee's job as a training section program manager.[11]

Mr. Lee's primary duty was not production work, but consisted of managerial tasks and supporting service to the Secret Service. Other employees who spend virtually all of their time [12] developing, coordinating and delivering training programs have been found to meet the primary duty test of FLSA. In *Bates v. United States*, GS–13 supervisory border patrol agents at the United States Border Patrol Academy were found to meet the primary duty test for their mix of managerial and support service duties as instructors and managers training border patrol agents. 51 Fed.Cl. 460, 462–63 (2002). In *West v. Anne Arundel County, Maryland*, EMS training lieutenants were found to satisfy the applicable FLSA private sector primary duty test, now codified at 29 C.F.R. § 541.2 (2004), much like the one applicable to federal employees, because the lieutenants "develop[ed], coordinate[d], implement[ed] and conduct[ed] EMS training programs." 137 F.3d 752, 764 (4th Cir.1998). Similarly, Mr. Lee's primary duty as a training section program manager falls squarely within the duties described in section 551.206(a)(1)-(2). Defendant has proved that Mr. Lee's GS–13 service as a training section program manager meets the primary duty test.

There is also no question that Mr. Lee's work duties meet the nonmanual work test. His responsibilities did not include any field work that might be considered manual work, and his specialized office work at the CAT training section required considerable training and experience. He had over six years of Secret Service employment prior to the CAT assignment, Def.'s App. at 238, and the supervision, program development, liaison and teaching duties of his position, *id.* at 240, required specialized expertise. Defendant has proved that Mr. Lee's GS–13 service at

CAT meets the requirements of section 551.206(b).

As to the discretion and independent judgment test, Mr. Lee testified that he did use discretion and independent judgment "[m]ore generally" as a GS–13 than when he was a GS–12. Def.'s App. at 237. Indeed, it is clear from his description of his CAT training section program manager duties, *id.* at 240, that frequent use of independent judgment was required in almost all of those duties, and that only general supervision was offered to assist him in these tasks. The Fourth Circuit held in *West* that fire department EMS training personnel met the discretion and independent judgment test under FLSA, 137 F.3d at 764, and their jobs are entirely analogous in this respect to Mr. Lee's position at CAT. Defendant has shown that Mr. Lee's GS–13 service at CAT meets the criteria of section 551.206(c).

Defendant has shown that Mr. Lee's GS–13 service from March 1991 through November 1993 was administrative and exempt from FLSA overtime requirements. Defendant's cross-motion for partial summary judgment is granted for Mr. Lee's claims for overtime back pay during the period from March 1991 through November 1993.

### E. The GS–13 Claims of Robert A. Reid

█ Mr. Reid filed his claim on January 21, 1994 and seeks FLSA overtime back pay from January 9, 1994 through October 1994, during which time he was a GS–13 1811 division training coordinator for the DEA, based in Denver, Colorado. Def.'s Cross-Mot. at 39; Pls.' Opp. at 44 n. 35; Def.'s App. at 246. The government contends that Mr. Reid's training duties rendered him exempt from FLSA's overtime pay provisions because his duties were administrative, and relies primarily on interrogatory responses of Mr. Reid prepared in April 2002. Def.'s Cross-Mot. at 31, 39–40. Plaintiffs offer Mr.

---

11. Plaintiffs did not assert that Mr. Lee's GS–13 service was in a position description attached to the March 17, 1992 Stipulation. Therefore, for the reasons discussed *supra* in reference to Mr. Cunningham, there is no conflict between the evidence presented by defendant and the parties' stipulation.

12. Employees who occasionally, as part of their criminal investigator duties, give public talks or participate as instructors in training programs do not meet the supporting service criteria of the primary duty test because of these tasks. *Adams I*, 27 Fed.Cl. at 20. But *Adams I* did not discuss the primary duty test as applied to training program managers such as Mr. Lee.

Reid's September 2002 declaration, Pls.' App. Ex. 54, as evidence that Mr. Reid's work did not meet FLSA's administrative exemption. Because the description of Mr. Reid's coordinator position differed in significant respects in his interrogatory responses and in his declaration, and because these differences raise a genuine issue of material fact, as described below, defendant's motion for summary judgment is denied for the GS–13 claims of Mr. Reid.

In his answer to interrogatories, Mr. Reid stated that he spent fifty percent of his time "planning and organizing basic and advanced training programs for agents and other law enforcement officers" and ten percent of his time acting as an instructor in training programs. Def.'s App. at 248. Mr. Reid further stated that he spent ten percent of his time preparing budget estimates for training; two percent of his time attending staff meetings; eight percent of his time contracting for training facilities; and five percent of his time developing lesson plans, visual aids, and other training materials. *Id.* at 249. Mr. Reid's declaration clarified that the eight and five percent blocks of his time, contracting for facilities and preparing training materials, respectively, were included in the fifty percent of his time devoted to overall planning and organizing training programs. Even with this corrected calculation, defendant has established the major part, or primary duty, of Mr. Reid.[13]

Mr. Reid's primary duty was focused on training programs. In his interrogatory responses, Mr. Reid provides a detailed description of his duties:

> [I] held meetings and spoke with agent and non-agent personnel as well as group supervisors in order to identify the training requirements they felt would be valuable to enhance their work productivity. [I] located training assets within the [DEA] as well as outside vendors to address training needs.

> [I] planned training events[, and] ... arranged for the materials and/or the instructors to be present ....

> [I] assisted the DEA Office of Training when they held various training functions in the Denver Division.... [I] also scheduled and coordinated "in service" training of agent and non-agent individuals who were selected by Supervision to attend training in other parts of the country. This included various paperwork to account for supervisor approval, funding, course description, necessary materials and certification of completion....

> [T]he Special Agent in Charge required that [I] run a minimum of four, two-week basic narcotics investigators schools, every year.... This task involved planning and scheduling facilities, instructors, materials, and timetables that would allow local students to obtain the basic building blocks needed to start a career in narcotics law enforcement.

> [I] evaluated the existing training program by observing and evaluating instructors, facilities and materials and lesson plans, and making appropriate changes, as necessary.

> ....

> [I] prepared and presented several blocks of instruction to state and local officers, giving oral presentations and briefings on such topics as undercover operations, informant management and defensive tactics.

> ....

> As training coordinator [I] frequently advised [my] directing supervisor of all activities [I] conducted.

Def.'s App. at 245–47. It is perhaps important to note two facts regarding Mr. Reid's position. First, although rank is not dispositive in determining administrative exemptions, Mr. Reid first obtained the division training coordinator position as a GS–12, not as a GS–13. Def.'s Cross–Mot. at 39. Second, his regional responsibility as a coordinator was not national program management, a role which was perhaps fulfilled by staff at the DEA Office of Training in Quantico, Virginia, Def.'s App. at 245, or the DEA Basic Agent Training Academy, Pls.' App. Ex. 54 at 548.

---

13. Because Mr. Reid's complaint was filed in 1994, after the March 17, 1992 Stipulation, he was not a party to that stipulation and it has no relevance to his primary duty.

Mr. Reid's declaration provides further information regarding his role as division training coordinator. This declaration states that Mr. Reid was not required to develop curricula for basic training schools; that he was provided with a list of instructors; that he did not prepare class materials for other instructors; and, that for his own instructional courses of approximately eight hours in duration and given four times a year, he obtained an outline from the DEA Basic Agent Training Academy and modified half of it. Pls.' App. Ex. 54 at 548. Mr. Reid also states that he had no authority to decide where training would occur and that while he prepared budget estimates, the total budgets were mandated by DEA headquarters. *Id.* at 549.

When the interrogatory responses and the declaration are put together, and the evidence is viewed in the light most favorable to plaintiffs' case, it is clear that Mr. Reid's primary duty meets the primary duty test, because no matter how circumscribed his authority, he was providing a supporting service to DEA, by coordinating all of the DEA training services for a four-state area. These duties meet the supporting service definition provided in *Adams I* because Mr. Reid "provide[d] a service of substantial importance to the agency," and because he assumed a personnel function that was clearly not production work as a criminal investigator. 27 Fed.Cl. at 15. Defendant has shown that Mr. Reid's GS–13 service meets the primary duty test for the relevant period.

There is also no doubt that Mr. Reid performed specialized, nonmanual work which required considerable special training, experience and knowledge. Although many of his tasks appear routine and mundane, he gave instruction on topics such as basic narcotics, undercover operations, informant management and defensive tactics. Def.'s App. at 246. He observed and evaluated instructors, and he adapted training curricula. *Id.* This is specialized work requiring specialized experience. Defendant has shown that Mr. Reid's GS–13 service as division training coordinator meets the nonmanual work test.

There is, however, a genuine issue of material fact concerning Mr. Reid's "frequent[ ]

exercise [of] discretion and independent judgment, under only general supervision, in performing the normal day-to-day work." 5 C.F.R. § 551.206(c). Mr. Reid's authority, as described in his declaration, was extremely limited. Mr. Reid's authority, as described in his interrogatory responses, appears to involve at least some discretion, in evaluating instructors and adapting curricula. This evidence, when viewed in the light most favorable to plaintiffs' case, does not clearly show that Mr. Reid's exercise of discretion and independent judgment was frequent. Defendant cannot prove a valid administrative exemption without meeting the test in section 551.206(c).

Because plaintiffs have raised a genuine issue of material fact regarding Mr. Reid's use of discretion in his work, the court denies defendant's cross-motion for partial summary judgment as to Mr. Reid's GS–13 claims, and denies plaintiffs' motion for partial summary judgment as to these claims.

**F. The GS–13 Claims of Sharon K. Wheeler**

Ms. Wheeler filed her claim on January 23, 1991 and seeks FLSA overtime back pay from January 23, 1988 through October 1994. Def.'s Cross–Mot. at 42; Pls.' Opp. at 47 n. 37. The applicable statute of limitations bars her claims for service from January 23, 1988 through January 22, 1989. Of the relevant period of time for her FLSA claims, January 23, 1989 through October 1994, apparently some of this time was GS–12 service, for which her claims have been settled, Oral Argument Tr. at 75–76, but the date of her promotion from GS–12 to GS–13 is not in the record before the court. Defendant presented evidence in support of its argument that from August 1991 through May 15, 1994, Ms. Wheeler's performance as the GS–13 1811 Dallas Field Division Public Information Officer (PIO) for BATF rendered her FLSA exempt. Def.'s Cross–Mot. at 42. For all other times during the relevant claims period, defendant presented no or insufficient evidence concerning Ms. Wheeler's duties. Therefore, defendant's cross-motion for partial summary judgment is denied for all of Ms. Wheeler's GS–13 service, if any, that

occurred from January 23, 1989 through July 1991, and from May 16, 1994 through October 1994. Plaintiffs' motion for partial summary judgment is granted for Ms. Wheeler's GS–13 service, if any, that occurred from January 23, 1989 through July 1991, and from May 16, 1994 through October 1994.

As the Dallas PIO from August 1991 through May 15, 1994, Ms. Wheeler functioned as the

> field division's principal media relations representative in responding to inquiries regarding significant, sensitive, and/or controversial ATF investigative activities, identifying and assessing the long– and short-term media and public affairs needs of the field division, developing and implementing techniques that best me[ ]t the field division's media and public affairs goals, and developing a comprehensive information dissemination program sensitive to the mission of the Bureau.

Def.'s App. at 277. The court notes that the BATF raid on the Branch Davidians in Waco, Texas occurred during 1993, and Ms. Wheeler's responsibilities as the PIO based in Dallas included, for a time, service as "the principal media contact for the Bureau [BATF]" at a time of intense public scrutiny. Def.'s App. at 289. In the employee performance appraisal of the year that included the Waco incident, BATF described other duties and accomplishments of Ms. Wheeler:

> She often recognizes opportunities to effectively communicate information about the Bureau and it[ ]s mission utilizing several different means of communication.
>
> . . . .
>
> She has initiated several projects that involve constant communicating with the media . . . . She has been able to enhance the effectiveness [of various BATF programs] . . . .
>
> Agent Wheeler routinely performs liaison duties to foster close working relationships and cooperation between the Bureau and other entities, both investigative agencies and the media. She has carefully established and maintains open lines of commu-

nication with the media, industry, and the general public. . . . She . . . organiz[es] press conferences, and liaison meetings. . . . She frequently speaks to community groups . . . .

> . . . .
>
> She is able to make decisions based on evidence and alternatives, and will initiate action when required.
>
> . . . .
>
> [S]he prepared numerous Press Releases and other documents for dissemination to the Press and Public.
>
> Agent Wheeler makes frequent oral presentations to the media, as well as civic groups and Organizations.

Def.'s App. at 289–91. The following year's evaluation included comments such as these:

> [S]he has created a vast network of contacts in the media community that have served ATF well. . . . Agent Wheeler . . . identified a need for information to be available to all ATF employees. As a result, she strongly recommended and arranged for multiple training sessions for all division personnel on the basics of the [Brady] [B]ill. . . . As a result of her efforts the general public as well as law enforcement received a higher quality of service.
>
> . . . .
>
> As the principal spokesperson for the Dallas Division in Community relations matters, Agent Wheeler has given countless presentations to schools, civic organizations and professional associations regarding ATF's mission.
>
> . . . .
>
> Agent Wheeler on several occasions during the evaluation period has displayed her ability to make independent sound decisions. . . . She routinely deals with [outside of regular business hours media] contacts with little or no supervision/direction from her immediate supervisor.

Def.'s App. at 293–95. There is no mention in these narrative evaluations covering July 9, 1992 through May 15, 1994 of any criminal investigative production work.[14]

---

14. Plaintiffs have not alleged that Ms. Wheeler's position description was attached to the parties'

March 17, 1992 Stipulation concerning the criminal investigative duties of plaintiffs. Thus, this

Defendant has established Ms. Wheeler's major part of her work duties, or her primary duty. Ms. Wheeler's primary duty satisfies the primary duty test of section 551.206(a)(2), because it is supporting service that clearly supports the mission of BATF, and is not criminal investigation work. In *Copas v. East Bay Municipal Utility District*, 61 F.Supp.2d 1017, 1026 (N.D.Cal.1999), the district court found that serving as a public relations officer for a public utility is exempt work according to the applicable FLSA primary duty standard. As is the case here, the public information officer in *Copas* was not the chief public information officer for the entire organization, but she did have a professional role that serviced the organization, rather than a production role. *Id.* at 1023–26. Defendant has shown that Ms. Wheeler's primary duty as PIO meets the primary duty test.[15]

The unrefuted evidence also shows that Ms. Wheeler's PIO service meets the non-manual work test of section 551.206(b). The scope of her duties, the need for effective communication of BATF's mission in a variety of settings, the range of topics upon which she presented information all show that this was specialized work that required considerable knowledge and experience. Defendant has shown that Ms. Wheeler's PIO service as a GS–13 from August 1991 through May 15, 1994 meets the nonmanual work test.

Finally, there is ample proof that Ms. Wheeler frequently exercised discretion and independent judgment under only general supervision, satisfying section 551.206(c). Her evaluations speak of frequent exercise of discretion, the independence of her decision-making and the general nature of her supervision. This evidence is uncontroverted. Plaintiffs point out that Ms. Wheeler's evaluations mention that she followed bureau guidelines, Pls.' Opp. at 47, but this does not negate the fact that she made frequent judgment calls of significance. If a public rela-

tions officer is so constrained as to present only "canned" information that is pre-approved, then that officer would not meet the discretion and independent judgment test. *See Shockley v. City of Newport News*, 997 F.2d 18, 28–29 (4th Cir.1993) (finding that media relations police sergeants made no significant decisions in their work, because they followed "highly detailed guidelines" and gave only "pre-approved answers"). But here, as in *Copas*, 61 F.Supp.2d at 1026–27, the public information officer role required creativity, initiative, sensitivity, and carried with it substantial decision-making authority. This role satisfies the discretion and independent judgment test of section 551.206(c).

Defendant has shown that Ms. Wheeler's GS–13 service as Dallas PIO for BATF is subject to a valid administrative exemption under the criteria now codified at 5 C.F.R. § 551.206. Defendant's cross-motion for partial summary judgment is granted as to her claims for the period from August 1991 through May 15, 1994.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that:

(1) Defendant's cross-motion for partial summary judgment, filed June 26, 2002, as to the claims of plaintiffs **Mark Owen King** and **James R. Martin**, is **DENIED** as moot.

(2) Defendant's cross-motion for partial summary judgment, filed June 26, 2002, is **DENIED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **GRANTED** as to plaintiff **Frederic J. Geiger's** GS–13 claims.

(3) Defendant's June 26, 2002 cross-motion for partial summary judgment and plaintiffs' April 26, 2002 motion for partial summary judgment are both **DENIED** as to plaintiff **Jose A. Grossett** for his claims for the period May 22, 1989 until December 1989. Defendant's June 26, 2002 cross-motion for

---

stipulation is of no relevance to her GS–13 FLSA claims.

**15.** Employees who occasionally, as part of their criminal investigator duties, give public talks or participate as instructors in training programs

do not meet the supporting service criteria of the primary duty test because of these tasks. *Adams I*, 27 Fed.Cl. at 20. But *Adams I* did not discuss the primary duty test as applied to public relations officers such as Ms. Wheeler.

partial summary judgment is **GRANTED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **DENIED** as to Mr. Grossett's claims for the period January 1990 through July 15, 1990.

(4) Defendant's June 26, 2002 cross-motion for partial summary judgment is **GRANTED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **DENIED** as to the claims of plaintiff **J. Lawrence Cunningham**.

(5) Defendant's June 26, 2002 cross-motion for partial summary judgment is **DENIED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **GRANTED** as to plaintiff **Lawrence J. Sams** for his claims for the period from August 1992 through October 1994. Defendant's June 26, 2002 cross-motion for partial summary judgment is **GRANTED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **DENIED** as to Mr. Sams' claims for the period from January 1989 through July 1992.

(6) Defendant's June 26, 2002 cross-motion for partial summary judgment is **DENIED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **GRANTED** as to plaintiff **Michael A. Lee** for his claims for the period from December 1993 through October 1994. Defendant's June 26, 2002 cross-motion for partial summary judgment is **GRANTED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **DENIED** as to Mr. Lee's claims for the period from March 1991 through November 1993.

(7) Defendant's June 26, 2002 cross-motion for partial summary judgment and plaintiffs' April 26, 2002 motion for partial summary judgment are both **DENIED** as to the GS–13 claims of plaintiff **Robert A. Reid**.

(8) Defendant's June 26, 2002 cross-motion for partial summary judgment is **DENIED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **GRANTED** as to plaintiff **Sharon K. Wheeler** for all of her GS–13 claims, if any, for service that occurred from January 23, 1989 through July 1991, and from May 16, 1994 through October 1994. Defendant's June 26, 2002 cross-motion for partial summary judgment is **GRANTED** and plaintiffs' April 26, 2002 motion for partial summary judgment is **DENIED** as to Ms. Wheeler's claims for the period from August 1991 through May 15, 1994.

(9) The parties shall **CONFER** and **FILE** a **Joint Status Report** on or before **June 30, 2005**, proposing how to proceed toward a final resolution of plaintiffs' outstanding claims in the subject matter.

(10) Each party shall bear its own costs.